[Civ. No. 13619.   Second Dist., Div. Three.   Jan. 29, 1943.]

MARIE JOHNSON, Respondent, v. BIMINI HOT SPRINGS (a Corporation) et al., Defendants; BIMINI INCOME PROPERTIES, INC. (a Corporation), Appellant.

Crider, Runkle & Tilson and A. F. Mack, Jr., for Appellant.

Porter C. Blackburn and G. M. Grant for Respondent.

WOOD (Parker), J.—Defendant, the owner of a public bathhouse and plunge which it operated for profit, appeals from a judgment in favor of plaintiff for damages for personal injuries sustained by her as a result of slipping and falling allegedly by reason of a soapy substance on the shower room floor. Trial was without a jury. Judgment was also in favor of defendant Zuchelli, the assistant manager of defendant corporation.

The contentions by defendant are: that (1) it was not negligent; (2) the trial court erred in admitting certain evidence;

and (3) plaintiff was contributively negligent. The amount allowed as damages is not in question on this appeal.

The shower room was described as follows: It was 12 feet in length and 11 feet in width. The entrance was near the center of the west side. On each side of the entrance there was a cold shower. The water for these two showers came directly from the city water system and was not heated. One shower was in the center of the north wall. Three showers were on the east wall and spaced about 3 feet apart. One shower was in the center of the south wall. The water for these five showers on the north, east and south walls came directly from the ground, was of a temperature of 95 degrees Fahrenheit, and was not heated after it came from the ground. There were two drains in the floor, the perforated covers of which were flush with the surface of the floor. One of the drains was about 4 feet from the north wall and was equidistant from the east and west walls. The other drain was about 3 feet from the south wall and also equi-distant from the east and west walls. The floor sloped gradually downward from the east and west walls to the drains, and the grade of each slope (a distance of 6 feet) was one inch. The floor was a sand-float red cement finish. The red color was not paint, but was in the cement. In the center of the ceiling there was a 100-watt light. The east wall of the shower room extended to the ceiling, which was 12½ feet from the floor. The other walls did not extend to the ceiling, but the tops of those walls were 10½ feet from the floor. There were no partitions between the showers. The shower pipes were the "gooseneck" type and extended out of the walls about 10 inches. The shower valves were in the "goosenecks" and were operated by a hanging cord. There was no receptacle for soap, or any receptacle or shelf in the shower room. There was nothing in the shower room except the shower pipes and shower heads. The shower room was not a part of the bath department of the bathhouse, but was for the use of the patrons of the plunge. The water system for the bath department was separate from, and not connected with, the water system for the plunge showers. The water for the bath department was heated.

Plaintiff testified in substance (except as to the extent of her injuries) that after her admission had been paid by a friend, she entered defendant's plunge about 1 p.m. of October 11, 1940, and remained there until 3:15 p.m., when she,

barefoot and clad in a bathing suit, went into the shower room to take a shower. It was the first time she had been in the shower room. The floor and her feet were wet. She turned on the first shower to the left of the door but it was scalding hot. She started to another shower on the other side of the room, was walking at a slow, ordinary walk and had walked a distance of approximately 3 feet when she stepped on something that threw her feet up and she fell upon the floor, striking her left elbow, left shoulder and head. She was more or less unconscious for a moment immediately after the fall. As she was walking to the shower, and before she fell, she saw that the floor in front of her was "mostly" maroon red, "some places redder than others," "some sections like a maroon floor would look dirty," and it had "grayish stuff on it, sort of soapy flem [sic]." As she lay upon the floor after the fall, there was a "slick feeling" under her arm and when she was moved by those helping her, she could feel her body "sliding on that soap or slick surface." She testified further: "Q. What was on the floor? A. Soap. Q. Did you see it on the floor? A. Well, it looked grayish but I knew it by the feeling of it that it was soap." It was a rather smooth cement floor and had a very heavy paint on it. In places where the paint had worn off, the floor was rougher, but other portions of it were very slippery. About two weeks after the fall she and her sister talked with defendant Zuchelli at his office in the bathhouse. (Over objection by defendant corporation that such conversation was hearsay and not binding upon the corporation, she testified concerning that conversation.) He said he was the manager over all managers. In response to a statement by plaintiff as follows, "Mr. Zuchelli, you certainly found the floor in a very slippery condition." He said, "I certainly did." He said further that the reason the floor was so slippery and got in that condition was that people came there purposely to wash themselves and their hair in the soft mineral water with soap, and it was impossible to stop them from using soap. She did not use soap and did not see anyone using soap in the shower room.

Plaintiff's sister testified in substance the same as plaintiff did concerning the conversation with defendant Zuchelli.

A witness, the swimming instructor, called by defendant, testified that he assisted in taking plaintiff from the floor im-

mediately after the accident and he did not see any foreign matter or soap on the wet floor.

A patron of the bathhouse, called by defendant, testified that she (the witness) was taking a shower under one of the showers on the back wall (east) and plaintiff was under a shower on the north wall to the right of the witness, which was not the shower next to the left of the entrance. Plaintiff left that shower to go to a shower to the left of the witness and when she had gone about 3 or 4 yards at a moderate speed, and was in front of the witness, she (plaintiff) slipped about 2 inches on her left foot, fell and grabbed for the witness as she fell but did not get hold of her. The floor was wet with water. She (witness) did not see soap or any foreign substance on the floor and she had not washed her hair there.

Another patron, the sister-in-law of the previous witness, called by the defendant, testified that she was in the room when plaintiff came in but she was not there when plaintiff fell. She (witness) had just gone through the door to leave, heard plaintiff fall, turned around, saw plaintiff lying on the floor, and went back into the room. Before the accident she (witness) did not see soap or any foreign substance on the floor. After the accident she did not look at the floor to determine whether there was any foreign substance on the floor. She had not been shampooing her hair or using soap there.

A witness, who was night janitor at the time of the accident and about 1½ years prior thereto, testified that he swept and hosed the shower room every night and that he had never found any soapy water or "slippery stuff" on the floor. On Saturday and Sunday nights he put chlorine all over the room, scrubbed it with a brush and hosed it again. The patrons get soap when they take a bath but not when they take a shower. He did his work after the pool had closed and by that time the floor of the shower room was dry.

A witness, who was the locker attendant at the time plaintiff fell, testified that the shower room was under her direction when she was on duty. She did not see soap or any foreign substance on the floor during the day of the accident. In answer to a question whether the mineral water in the showers was used for shampoo purposes, she said, "I couldn't say about that." Thereupon another question was, "You couldn't say?" to which she answered, "They might use it

for shampoo, we also have mineral baths and they might shampoo their head in there, and we also have a tub."

A witness, a consulting civil engineer, who qualified as an expert in building construction, called by defendant, testified that he inspected the shower room the day he gave his testimony. He made friction-resistant tests on the floor when it was dry, and at another time when it was wet. The result of the dry test was that the dry floor showed about 14 per cent greater friction resistance than the average of other similar dry shower floors similarly tested. The result of the wet test was that the floor indicated 33 per cent greater friction resistance when wet then when dry.

Defendant Zuchelli testified that he was the assistant secretary and resident assistant manager of defendant corporation at the time of the accident (it was stipulated that he was such secretary and manager). That subject to the approval of the manager, he hired, fired, adjusted hours, determined payrolls, collected rents, approved bills, made all purchases, and did what one might do to adequately run a business for someone else. The manager did not stay on the premises. The next morning after the accident, plaintiff telephoned to him, the resident assistant manager, said she did not know a doctor and asked him to suggest a name of a doctor. He told her that their employees were sent to the defendant's compensation doctors, and if she wanted to go there, he thought she would get the best treatment. He had a conversation with plaintiff and her sister on October 14th, in his office the substance of which was that they were not satisfied with the compensation doctors and they knew a certain doctor and he (witness) told them to change doctors if they were not satisfied. He did not say he would pay for any medical treatment or anything else. He did not say that the floor of the shower was always slippery. The floor was "always kept as neat and clean and non-slippery as the floor in your own bathroom." During a period of at least three or four weeks she (plaintiff) telephoned his office on an average of three to five times a day and he talked with her on 50 per cent of the occasions. In those conversations she said she was suffering, was dissatisfied with the compensation doctors, and that she wanted to know if he could do anything about it. He said he could not do anything whatever. In

response to questions by the court, he said he had had difficulty occasionally "with patrons who wanted to use the shower room as a bathing place and use soap there," but they stopped them as soon as they saw they tried to do so. "Q. By the court: What did you see them try to do? A. Wash their hair. Q. By the court: With what? A. Soap. I never saw them, your Honor, that is hearsay." He testified further: "Q. By the court: So that before Mrs. Johnson was hurt, before she came to see you, you had had difficulty in the shower room caused by patrons using soap to wash their hair?" (Objection by defendant was overruled.) "A. Not then, your Honor, just the necessity of wanting people to do so. Q. By the court: Did you tell that to Mrs. Johnson? A. I didn't tell her that, she asked me if people ever used soap in there and I said, 'Occasionally, but we stop it as soon as we see them doing so.' Q. By the court: Once, or more than once? A. Well, I never stopped it at all, nor did I ever have any report to me that that ever had been stopped. Q. By the court: Why did you say you stopped it? A. If it occurred it was stopped by those people who were in charge of the locker room." No signs were posted warning the patrons not to use soap in the showers. He told the employees not to let the patrons use soap in the showers. He testified further that the party who sells admission tickets had a stock of soap which came from the stockroom. "Q. Is it [soap] available to all those who patronize the Bimini showers? A. Well, it is available if they ask for it. Q. Is that for sale or does it go along as a gift to the patrons? A. It isn't for sale, if they ask for it it is handed to them." He testified further: "Q. Well, then, as I understand it, the use of the soap goes along with the purchase of the ticket if requested by the prospective patient? A. That is correct." He testified further: "By the court: Q. Mr. Zuchelli, you testified a little while ago that your practice is to supply soap to patrons who are going into that shower, was that your practice before October 11, 1940? A. Yes, sir, it was."

The findings of the court included the following: (1) "That the said defendant negligently and carelessly permitted the floor of the shower room to have deposited on it a soapy substance consisting of soap in its dissolved and liquid form, the presence of which the plaintiff did not know and comprehend; that the said soapy substance caused the floor

of the said shower room to become slick and slippery''; and (2) that plaintiff proceeded ''in the ordinary and customary manner, with due circumspection and care to use the shower room so provided by said defendant, and as she was proceeding across a part of the floor of said shower room, and as she stepped upon said floor, her right foot came in contact with the slick and slippery substance thereon and was thereby thrown violently to the floor of said shower room, with such force that she suffered physical injuries.'' The court concluded that plaintiff was not guilty of contributory negligence.

One question is whether there was a soapy substance on the floor. There was no soap receptacle, or any receptacle or shelf in the shower room where soap could be placed. It is not reasonable to assume that it was placed on the tops of the three walls which were 10½ feet from the floor. The other wall extended to the ceiling. There was nothing in the shower room except the shower pipes and heads, which extended out of the walls about 10 inches. There was no partition between the showers and there was not a separate drain under each shower. The sloping floor carried the water from the seven showers to two drains located in the center line of the floor about one-third of the length of that line from each end of the room. Plaintiff said she saw ''grayish stuff,'' ''a sort of soapy flem [sic]'' on the dirty appearing red floor (of different shades of red) in front of her before she fell and that she knew, immediately after she had fallen, that it was soap by the feeling of it on her body as she lay upon the floor. The resident manager of defendant, Zuchelli, said, according to plaintiff, the reason the floor was so slippery was that patrons washed themselves and their hair in the soft mineral water with soap, and said it was impossible to stop them from using soap. The resident manager said that before plaintiff's accident he had had difficulty in the shower room caused by patrons using soap to wash their hair; that he told plaintiff that people used soap in the showers occasionally but they (employees of defendant) stopped them as soon as they saw them using soap. He also said he directed the employees not to allow the patrons to use soap in the showers but that no signs were posted announcing that the use of soap in the showers was prohibited. He also said that the ticket seller had a stock of soap which was available to all who patronized defendant if they asked for it; that the

soap was not for sale but "the use of soap goes along with
the purchase of a ticket, if requested"; that this practice
"to supply soap to patrons who are going into that shower,"
existed before October 11, 1940. Whether a soapy substance
was on the floor was a question of fact for the trial court.
The evidence was sufficient to warrant its affirmative finding.

Another question is whether plaintiff slipped by reason
of the water alone on the floor or by reason of a soapy sub-
stance in the water. This also was a question of fact for the
trial court. According to defendant's witness, who made
the friction-resistance tests, the floor when wet with water
was 33 per cent safer, insofar as slipperiness was concerned,
than when it was dry. The evidence was sufficient to war-
rant the finding that plaintiff slipped by reason of a soapy
substance.

Another question is whether defendant negligently per-
mitted a soapy substance to be on the floor. The admonitions
to the employees, by the resident manager, to prohibit the
patrons from using soap in the shower room, and the state-
ment by him to plaintiff that the use of soap therein caused
a slippery condition, indicated that he knew the use of soap
in the shower room created a dangerous condition for the
patrons. The practice of defendant in furnishing soap to its
patrons for use in that shower room was inconsistent with
its oral instructions to its employees not to let the patrons
use soap in the shower room. Such inconsistency between its
words, indicating an effort to prohibit the use of soap in the
shower room, and its deeds, indicating encouragement to use
soap in the shower room, showed a failure on the part of
defendant to exercise the amount of care required of it for
the safety of its patrons who had paid a fee for the privilege
of using the premises. Such furnishing of soap established
that defendant consented to the use of soap in the showers.
The granting of consent to use soap in the shower room, when
defendant had knowledge that such use of soap created a
dangerous condition, was a failure by defendant to exercise
ordinary and reasonable care for the safety and protection
of its business invitees. It did not appear that any of de-
fendant's employees or officers actually knew, in the particu-
lar instance here involved, that the soapy substance was on
the floor. It did appear, however, that the circumstances of
this particular instance were such that defendant should
have known of, or should have taken reasonable precaution

to guard against, the presence of the foreign matter on the shower room floor. Defendant knew that soap was furnished to the patrons upon request for use in the showers, that no signs were posted directing that soap should not be used therein, that it was reasonably probable that soap would be used therein and reasonably probable the use thereof would cause a slippery condition on the floor. "The true ground of liability rests on the proprietor's superior knowledge of the perilous instrumentality and the danger therefrom to invitees, over that of the invitee." (*Touhy* v. *Owl Drug Co.*, (1935) 6 Cal.App.2d 64, 66 [44 P.2d 405].) Plaintiff had never been in the shower room prior to the accident. She did not use soap therein and did not see anyone using soap there. It did not appear that plaintiff knew that defendant furnished soap to its patrons for use in the shower or that it permitted soap to be used therein. The transcript shows that the locker attendant, who also had charge of the shower room, said "No," in response to a question as to whether she saw the shower room floor on the day of the accident. Apparently that answer, "No," was a typographical error in view of her answers that the floor was wet and that she helped to lift the plaintiff from the shower room floor. If, in fact, the answer was, "Yes," and the locker attendant saw the shower room floor on that day, it does not appear whether she saw it before or after plaintiff fell. If she saw it before the accident, it does not appear how many times she saw it, whether she was in the shower room or where she was when she saw it, or what inspection she made of it, if any. It was stated in *Chardon* v. *Alameda Park Co.*, (1934) 1 Cal.App.2d 18 [36 P.2d 136], at page 24, "The cases cited by defendant . . . deal generally with the rule governing liability for injuries to invitees caused by defects on private premises; whereas the proprietor of a public amusement park is charged with a stricter accountability for the safety of those who have paid an admission fee to enter his premises." It was further stated in that case, at page 21, "But it is also well settled that the proprietor of a public place of amusement is required to exercise the precaution, skill and care commensurate with the circumstances to maintain the place . . . in a reasonably safe condition for the use intended. . . . " It was stated in *Tuttle* v. *Crawford*, (1936) 8 Cal.2d 126 [63 P.2d 1128], at page 130, "Whether the floor of a store or public market place was so negligently maintained as to render the person

902

responsible for its condition liable in damages is a question of fact to be decided by the jury. The same rule is also applicable to contributory negligence." The evidence was sufficient to support the finding that defendant negligently permitted a soapy substance to be on the floor.

■ Another question is whether plaintiff was guilty of contributory negligence. It is true, as testified by plaintiff, that whatever it was that she saw on the floor the day of the accident was what she saw as she was walking before she fell. The description of the floor and the water thereon, as it appeared to her when she was walking before she fell, has been stated hereinabove. The different shades of red color in the floor, the dirty appearance of the red floor, the slope thereof, and the "grayish stuff" in the water were not such dangers that it should be concluded as a matter of law that she was contributively negligent. That was a question of fact, and the finding of the court that plaintiff was not guilty of contributory negligence was warranted by the evidence.

■ Another question is whether the alleged declarations of defendant Zuchelli, regarding the slippery condition of the floor and the use of soap in the showers, were admissible against the defendant corporation. It was stipulated that Zuchelli was resident assistant manager and assistant secretary of the corporation, and that he was the manager over all managers at the bathhouse. ■ It was competent for him as resident assistant manager and assistant secretary of the corporation to testify as to the nature and scope of his authority. (*Kast* v. *Miller & Lux*, (1911) 159 Cal. 723, 727 [115 P. 932].) His testimony, stated above in some detail as to his duties, showed that he was authorized to and he did perform such duties as would usually be required of one in full charge of the personnel and operation of such an institution as the defendant corporation. His agency and the scope thereof were established properly at the trial. ■ The declarations of defendant Zuchelli were admissible. In the case of *Shields* v. *Oxnard Harbor Dist.*, (1941) 46 Cal.App.2d 477 [116 P.2d 121], the defendant McDougall, an agent of the defendant corporation, was involved in an accident while operating an automobile owned by the corporation. The court said at page 488, "The rule is established in California that after evidence of an agency has been received as in the instant case, declarations or admissions of the agent are admissible against the employer. (§ 1870, subsec. 5, Code Civ. Proc.) Therefore, the trial court properly admitted in the

present case evidence of declarations and admissions made by defendant McDougall at the time of and after the accident.'' The opinion in that case does not show what statements were made by the agent, but the reporter's transcript therein shows (p. 26) that the plaintiff testified as follows: ''I said, 'Well, it kind of looks like you [McDougall] are in the wrong.' 'Yes,' he says, 'I guess it does.' ''

The evidence shows that it was not intended that the plunge showers should be used for bathing with soap, inasmuch as no soap receptacles were provided, there was a separate department for bathing, and defendant's employees asserted that they had attempted to prohibit the use of soap in the plunge showers.

The trial court had the benefit of the personal observation of the witnesses. It is the province of an appellate court in reviewing the findings of a trial court to consider not the relative weight of conflicting evidence but the legal sufficiency thereof to support the findings.

The judgment is affirmed.

Desmond, P. J., concurred.

SHINN, J.—I dissent. In defendant's public bathhouse were a plunge, tub and shower bath. When patrons bought bath tickets they were furnished soap if they requested it. The floor of the women's shower room was of concrete. It had a ''float finish'' which gave it a porous texture and it was not slick; it had 33 per cent greater friction resistance when wet than when dry. It was admitted by plaintiff at the trial that the floor was properly and safely constructed. The court found that ''. . . defendant negligently and carelessly permitted the floor of the shower room to have deposited on it a soapy substance consisting of soap in its dissolved and liquid form, the presence of which the plaintiff did not know and comprehend; that the said soapy substance caused the floor of the said shower room to become slick and slippery.'' This is the only finding of negligence.

Plaintiff testified as follows: ''Q. By Mr. Tilson: Did you actually see any soap on that floor before you fell? A. I would say that there was soap on there. Q. I mean could you see it as you were walking along? A. Well, you know, it looks like a flem. Q. The only question I asked was, you said you could see soap on the floor, I am asking you when you walked this three feet to where you fell, could you see

this soap on the floor? A. Well, it was soap. Q. Did you see it as you were walking this six feet? A. A grayish white soap which appeared on top of the drain. Q. Did you see it as you were walking that three feet? A. Yes, I saw there was that soapy flem. . . .''

There was evidence from which the court could have concluded that defendant's employees and assistant manager had knowledge that women patrons washed their hair in the soft water of the showers and that they occasionally used soap. The effect of the judgment is to impose upon the proprietor of a public bathhouse the duty of seeing that the patrons do not use soap in bathing themselves. If liability is to be imposed in such cases it could readily be extended to apply to club buildings, hotels and other establishments where bathing facilities are provided for the common use of members and patrons. I do not think it is a sound rule which imposes such restriction upon the ancient and respected custom of the use of soap and water in the bath. The proprietor of a public bathhouse is furnishing a public service and he has a right to conduct his business so as to meet the reasonable demands of his patrons. Every business has its own natural characteristics; it is not to be expected that the floor of a bathhouse or a ballroom or a skating rink will be kept in the same condition as to safety as the floors of storerooms and hotel lobbies are kept. There are certain peculiar hazards attached to the use of the former. If the premises, although of such a nature as to render their use somewhat hazardous, are nevertheless maintained in a condition such as is commonly found and is to be expected in similar establishments and in a condition essential to their proper use for the purposes to which they are devoted, there is no negligence. Defendant was not negligent in failing to police the women's showers to see that no soap was used.

The responsibility of using care is not entirely upon the proprietor. The customer or patron is under the duty to anticipate those hazards which inherently and commonly attend the use of premises for particular purposes. Plaintiff not only should have anticipated that there might be some soapy substance on the floor of the shower room but she actually saw it. I cannot help believing that if she had exercised the care which her knowledge of the facts demanded, she would not have had her regrettable accident. The evi-

dence, in my opinion, failed to establish liability of defendant for negligence, and the judgment should be reversed.

A petition for a rehearing was denied February 26, 1943. Shinn, J., voted for a rehearing.

Appellant's petition for a hearing by the Supreme Court was denied March 29, 1943. Traynor, J., voted for a hearing.