[No. G015996. Fourth Dist., Div. Three. Nov. 25, 1997.]

GEORGE O'MARY, Plaintiff and Appellant, v.
MITSUBISHI ELECTRONICS AMERICA, INC., Defendant and Respondent.

COUNSEL

Fields & Creason, Bruinsma & Hewitt, Dirk Bruinsma and Maria K. Aarvig for Plaintiff and Appellant.

Munger, Tolles & Olson, D. Barclay Edmundson and Monica Wahl Shaffer for Defendant and Respondent.

OPINION

SILLS, P. J.—

## I

### *Introduction*

Just after attending a president's meeting, Herb Craft, vice-president in charge of program development for Mitsubishi Electronics America, Inc., in 1990, called "most" of "his managers" into a conference room. One of those managers was Robert Jones. Craft told his managers that Mr. Ihara, who was the person responsible for founding the various Mitsubishi entities in the United States and was a senior managing director at Mitsubishi Electronics, had made a statement "about getting rid of managers who were over 40 and replacing them with younger, more aggressive managers." At the meeting, Mr. Kawasaki, president of Mitsubishi Electronics, concurred with Ihara's statement.

Jones later related what he heard at the meeting in a deposition in this age discrimination case against Mitsubishi Electronics. Before the case came to trial, however, Jones died. At trial, whether his deposition testimony concerning the meeting called by Craft could be admitted as evidence was the subject of a major dispute. After considerable argument, the trial judge decided to exclude the evidence as "hearsay of the worst order." Mitsubishi Electronics ultimately obtained a defense verdict.

There is, of course, no doubt that if Mitsubishi Electronics's policy really was to "get rid of managers over 40" and replace them "with younger, more aggressive managers," the policy represented a serious violation of state and federal age discrimination laws. Age discrimination laws target the generality that an individual cannot do the work just because he or she has reached a certain age. (E.g., *Hazen Paper Co.* v. *Biggins* (1993) 507 U.S. 604, 610 [113 S.Ct. 1701, 1706, 123 L.Ed.2d 338] ["Congress' promulgation of the ADEA was prompted by its concern that older workers were being deprived of employment on the basis of inaccurate and stigmatizing stereotypes."]; *Metz* v. *Transit Mix, Inc.* (7th Cir. 1987) 828 F.2d 1202, 1213] (dis. opn. of Easterbrook, J.) ["The Act prohibits adverse personnel actions based on myths, stereotypes, and group averages, as well as lackadaisical decisions in which employers use age as a proxy for something that matters (such as gumption) without troubling to decide employee-by-employee who can still do the work and who can't."].) Making a layoff decision on the assumption that an individual manager is necessarily less "aggressive" just because he or she has reached a certain age is precisely the sort of thing the age discrimination laws were enacted to prohibit.

In this appeal we hold that the jury should have been allowed to hear the undoubtedly relevant evidence, and therefore the judgment must be reversed. Jones's deposition—the first level of the purported triple hearsay—could be used as evidence because Jones was unavailable as a witness. (See Code Civ. Proc., § 2025, subd. (u)(3)(B)(iii).) And Ihara's and Kawasaki's statements —the third level—were admissible as admissions because it was undisputed that Ihara was authorized to speak for Mitsubishi Electronics's Japanese parent company (which had the right to dictate policy to its American subsidiary) and Kawasaki was the president of Mitsubishi Electronics itself. (See Evid. Code, § 1222.)

The crucial issue is whether *Craft's* statement was admissible. On this point there is a dispute as to whether Craft, like Ihara or Kawasaki, was authorized to speak for the company.

We must respectfully differ with the trial judge. As we explain in greater detail below, the circumstances of Craft's meeting showed that he was

indeed authorized to speak for Mitsubishi Electronics in the context in which the meeting occurred. The case must therefore be remanded for retrial. To guide the trial court on remand we also address the multitude of other contentions made by George O'Mary. No prejudicial error appears except in the instance of one jury instruction, which said that older workers tend to leave the work force and younger workers tend to enter it. That instruction was error because it encouraged the jury to substitute demographic generalities for the specifics of the case at hand.

## II

### *Facts*

George O'Mary was 45 years old when he began working for Mitsubishi Electronics of America on March 30, 1981. During the time that O'Mary worked for Mitsubishi Electronics, the manufacturer tried unsuccessfully to enter the personal computer market. By 1990, Mitsubishi Electronics had decided to abandon the market after losing almost $40 million in fiscal years 1989 and 1990. O'Mary was laid off in November 1990. He then brought this action, along with Robert Jones, for both age discrimination and breach of a promise of contract alleging that Mitsubishi Electronics had promised lifetime employment.

Robert Jones died after his deposition was taken but before trial. Large segments of his deposition were read to the jury. One of those segments concerned a staff meeting—not the meeting we have already referred to—which occurred with Mr. Fukuda, one of Mitsubishi Electronics's board members. This staff meeting began with Fukuda talking about production and production schedules. Then Fukuda started talking about a recent "reorganization" of Mitsubishi. As Jones related Fukuda's statement in the deposition, ". . . he made the statement that MELA [Mitsubishi Electronics] planned to eliminate managers who were over 40 and replace them with younger, more aggressive managers." In fact, Fukuda made the statement twice in the meeting. The jury heard this part of Jones's deposition.

Jones's deposition then progressed to *another* meeting he attended, in February or March 1990, which Craft "called" of "his managers," one of whom was Jones, on the same day that Craft had attended a "president's meeting."[1] Jones' said, "Mr. Craft came back. He got hold of some of the managers to come into the conference room. It was very much on the spur of the moment. He told us he had been to the president's meeting."

[1]Mitsubishi Electronics argues that the word "called," as used in the appellant's statement of the facts, is a misstatement of the record. On this point the appellant has the better of the

At this point counsel for Mitsubishi Electronics made a hearsay objection. The jury was excused and the objection ultimately sustained after the court heard argument as to Craft's statement's admissibility as either an admission (see Evid. Code, §§ 1220-1228.1) or a statement of plan, motive or intent (Evid. Code § 1250). Had the jury been allowed to continue hearing the rest of Jones's deposition, it would have heard that, "on the spur of the moment" after Craft came back from the president's meeting, he "got hold of a few of the managers to come into the conference room," where he told them that at the presidents meeting Ihara made a statement about "getting rid of managers who were over 40 and replacing them with younger, more aggressive managers." Further, Mr. Kawasaki—the president of Mitsubishi Electronics —"concurred."

It was undisputed at trial that Craft had no involvement in or authority over O'Mary's layoff. For its part, Mitsubishi Electronics presented evidence that O'Mary's layoff was the result of reasons independent of O'Mary's age: The company was shutting down its personal computer business, which was O'Mary's area of concentration; the remaining business was in an area (so-called "peripherals") which was out of O'Mary's experience or expertise; O'Mary's four field representatives were themselves eliminated; the criteria by which the company selected those whose employment was to be terminated was (1) need for skills, (2) continued viability of their positions, and (3) seniority. Moreover, Mitsubishi established that Fukuda—who had made the statement of Mitsubishi's plan to replace over-40 managers with "aggressive" younger managers, which the jury *did* hear—was head of a different division of Mitsubishi Electronics than the one in which O'Mary worked. The jury, as we have indicated, returned a defense verdict. From the ensuing judgment O'Mary has brought this appeal.

argument. Here is the exact text of the relevant portion of Jones's deposition which the jury heard before a hearsay objection was interposed:

"Q. [Referring to the "president's meeting"]: That was a meeting which you did not attend; is that right?

"A. That's correct.

"Q. Mr. Craft attended this meeting; is that correct?

"A. Yes.

"Q. Now, you say in here that Mr. Craft called his managers to a conference room and said he wanted to talk to you about that. Is that a correct statement of what happened?

"A. No. As I have indicated, most of the managers, because I'm not sure everyone was there."

It is clear from Jones's comment, "I'm not sure everyone was there," that he *was* testifying Craft had "called" *most* of "his managers" into the room, but he did not call *all* of them.

III

*Craft's Statement Was Admissible as an Authorized Admission*

Evidence Code section 1222 provides: "Evidence of a statement offered against a party is not made inadmissible by the hearsay rule if: [¶] (a) *The statement was made by a person authorized by the party to make a statement or statements for him concerning the subject matter of the statement*; and [¶] (b) The evidence is offered either after admission of evidence sufficient to sustain a finding of such authority or, in the court's discretion as to the order of proof, subject to the admission of such evidence." (Italics added.) Consequently, if O'Mary showed by admissible evidence that Craft was authorized to speak for Mitsubishi Electronics when he related Ihara's statement and Kawasaki's concurrence with it, Craft's statement, as set forth in Jones's deposition, should have been admitted.

The authority of a declarant employee to make a statement "for" an employer "concerning the subject matter of the statement" can be implied, as well as express. (See Jefferson, Cal. Evidence Benchbook (Cont.Ed.Bar 1982) § 3.4, p. 181.) For this reason the question of an employee's authorization to make a given statement can present a tricky problem for a trial court, because the determination necessarily depends on the particular facts and circumstances of each case viewed in the light of the substantive law of *agency*, as distinct from evidence. (See Mendez, Cal. Evidence (1993) § 7.03, p. 134, fn. 13 ["whether the declarant had the authority to make the statement 'is to be determined in each case under the substantive law of agency' and not by the law of evidence"].)

In general, as is illustrated by the case law on the subject, the determination requires an examination of the nature of the employee's usual and customary authority, the nature of the statement in relation to that authority, and the particular relevance or purpose of the statement. For example, in *Peterson Bros.* v. *Mineral King Fruit Co.* (1903) 140 Cal. 624 [74 P. 162], the court held, in a contract dispute over whether a supply of prunes was up to the standard called for in the contract, that the manufacturing superintendent of a prune grower did not possess authority to speak "for" his employer when he told a customer that certain prunes were not "merchantable." The court reasoned the superintendent's job was not "so connected with the sale of the prunes as to make him an agent in the transaction of their purchase." (*Id.* at p. 630.) The declarant was "employed to superintend the preparation of the prunes for sale," not to facilitate the "transaction of the sale." (*Ibid.*; see also *Luman* v. *Golden Ancient Channel M. Co.* (1903) 140 Cal. 700, 709-710 [74 P. 307] [superintendent of mine did not have authority to speak for employer as to *cause* of accident].)

A similar disconnection between the employment and the statement made the difference in *Crawford* v. *County of Sacramento* (1966) 239 Cal.App.2d 791 [49 Cal.Rptr. 115], a medical malpractice action based on the theory that the plaintiff's decedent had been given too much anesthetic during an operation. The declarant was an internist who had not been present during the surgery, but who talked to the patient's sister *after* the operation, and told the sister that too much anesthetic had been given. The court pointed out that the internist was not "high" enough in the "hospital's hierarchy" so as to be its "spokesman to make admissions." (*Id.* at pp. 800-801.) Nor, given the internist's lack of presence in the operating room, could his statement "concern a *matter* within the scope of his agency." (*Id.* at p. 801, original italics.)

By contrast, *Johnson* v. *Bimini Hot Springs* (1943) 56 Cal.App.2d 892 [133 P.2d 650] involved a situation where the declarant's place in the employer's "hierarchy" *was* high enough to render the statement an admission. In *Johnson*, an individual who served as a combination resident assistant manager, assistant secretary of the corporation, and "manager over all managers" of a bathhouse was held to have had authority to admit to the plaintiff, two weeks after she fell on what she claimed was a soapy shower floor, that he found the floor in a "very slippery condition" after the fall. (*Id.* at pp. 895, 902-903.) While the *Johnson* court did not elaborate on its ruling, it seems that the declarant's high place in the employer's hierarchy plus the nature of his duties as manager of the operation allowed the court to conclude he was speaking "for" his employer.

*Miller* v. *Anson-Smith Construction Co.* (1960) 185 Cal.App.2d 161 [8 Cal.Rptr. 131] emphasized the connection between the duties of the employee and the nature of the statement. In that case, a general contractor doing some building work for the state Department of Fish and Game employed a general superintendent, whose duties included supervising the subcontractors. A painting subcontractor fell into a dispute with the general contractor over whether his painting was of sufficient quality, and the question arose as to whether a recommendation letter which the general superintendent had written for the painter, basically saying his work was "more than satisfactory," was admissible. (*Id.* at p. 165.) "[U]nder the circumstances," said the court, the answer was yes. He "passed on the work performed and approved all progress reports." (*Id.* at p. 166.) Moreover, it made no difference that the admission was contained in a letter of recommendation because the issue turned on the superintendent's authority to make the statement, as distinct from the authority to write the recommendation letter. (*Ibid.*)

In the present case, as we have already indicated, there really is no question of Ihara's authorization to make an authoritative statement on

behalf of the company. He was, after all, the *founder* of the various Mitsubishi entities in the United States. Nor is there any question that Kawasaki's concurrence was authorized. He was the president of the company.

Turning to Craft, it is undisputed that he, like Ihara and Kawasaki, occupied a particularly high place in the employer's hierarchy. Place in an employer's hierarchy undoubtedly is important in determining authority to speak; the court in *Crawford* v. *County of Sacramento*, *supra*, 239 Cal.App.2d 791 went so far as to quote from a 1964 Law Revision Commission Report which indicated that place in the employer's hierarchy was *the* "differentiating factor" in California case law on authorized admissions. (*Crawford*, *supra*, 239 Cal.App.2d at p. 800, quoting Tent. Recommendation and Study Relating to the Uniform Rules of Evidence, art. VIII, Hearsay Evidence (Aug. 1962) 6 Cal. Law Revision Com. Rep. (1964) appen. pp. 484-490.)

Even so, we do not go so far as to say that the mere fact the declarant Craft was a vice-president automatically conferred on him authority to make admissions on behalf of the company. But there is more here than just Craft's high place. The nature of the statement and its particular relevance comes within what an ordinary person would expect to be the scope of Craft's authority.

*W. T. Grant Co.* v. *Superior Court* (1972) 23 Cal.App.3d 284 [100 Cal.Rptr. 179] is instructive in regard to statements of company policy made by individuals placed high in an employer's hierarchy. There, the store manager of a chain discount department store told a television repairer that the sale of repossessed television sets as new was "company policy" and it was none of the repairer's business to question that policy. (See *id.* at p. 286.) Reviewing a hearsay challenge at a preliminary hearing on a criminal charge against the department store for grand theft, the appellate court held that the store manager's statement qualified as an admission because, "[a]s store manager, [he was] deemed to possess the usual and customary authority of a retail store manager," which included authority to fix the "representations on which company merchandise [was] sold." (*Id.* at p. 286.) The court allowed, as the issue arose from an objection made at a preliminary hearing, that at trial the store might produce evidence to show the manager's "lack of authority to establish or interpret company policy along the lines indicated by his admission," but, at least for the moment, the evidence was admissible. (*Id.* at p. 287.)

The present case is, if anything, easier than *W. T. Grant.* We are not even dealing here with Craft's authority, as vice-president, to "establish or interpret" company policy—simply to *relay* it to his subordinates. It is beyond

peradventure that the "usual and customary authority" of a vice-president certainly includes authority to convey or relay company policy to subordinate managers. The role of a vice-president is to coordinate the activities of his or her middle managers to accomplish the goals of the president and board of the company.

Moreover, the context of the meeting shows authorization. Craft was calling a meeting of "his" managers—not just anybody he met in the hallway or by the water cooler—in a company conference room—not the parking lot or a local bar—on company time to explain what a founder of the company had expressed was policy and the current president of the company concurred in.

Mitsubishi Electronics argues that there was no evidence that Craft was authorized to report on what others said at the president's meeting. The argument, however, distorts the normal presumptions in any corporate managerial hierarchy. It is certainly within the province of a company vice-president to "carry the word" of company direction to his or her subordinates when the vice-president receives that word from the very highest levels of the firm. The normal presumption is that the managers and executives who hear an announcement of company policy are to carry that policy to their "troops," who will be expected to "get with the program."[2]

Mitsubishi Electronics lays great stress on the fact that Craft was not in the loop on plaintiff O'Mary's layoff. But that stress ignores the precise nature of Craft's statement. Craft was conveying company policy to subordinates, *not* stating the reason for O'Mary's particular dismissal. If Craft had said, "O'Mary was laid off because Ihara said he was too old," Mitsubishi would have a point. The evidence would be offered to show why O'Mary was laid off, and Craft's lack of personal knowledge as to that exact question would be dispositive.

Craft's statement, however, was relevant for a more subtle purpose: to show that Mitsubishi Electronics had a company policy of replacing older managers with younger managers whom it assumed would be more aggressive, and the jury could take the very existence of that policy into account in determining whether O'Mary's layoff, in particular, could be linked to that policy. This case may be thus contrasted with two federal decisions relied on

[2]That is the crux of illegal company policies in the context of the law governing authorized admissions: If you announce them to high-level managers but tell the managers not to breathe a word about them, you are acknowledging that the policies are illegal, and cannot face the light of disclosure. Otherwise, you have every reason to expect that the managers who heard your announcement are going to convey it—and will have authority to convey it—down the line.

by Mitsubishi Electronics, *Hill* v. *Spiegel, Inc.* (6th Cir. 1983) 708 F.2d 233, and *Purrington* v. *University of Utah* (10th Cir. 1993) 996 F.2d 1025. In each of those cases, the declarant's statement went directly to why a specific action had been taken with regard to a particular civil rights claimant, *not* to the existence of a discriminatory policy. In *Hill*, three managers all stated that the reason for a fellow manager's discharge was age, but the discharge was not within the "scope" of their employment. (See *Hill*, *supra*, 708 F.2d at p. 237.) Similarly, in *Purrington* the statement by a chair of a university committee that a particular individual had been removed from the committee by someone else to "punish" her was not admissible, because the removal from the committee was within the authority of that other person, not the committee chair. (See *Purrington*, *supra*, 996 F.2d at pp. 1034-1035.)

Because Craft's statement went to the existence of a discriminatory policy, it was within his authority to make it in the context of a meeting he called in a company conference room on company time for most of his subordinates. It makes no difference that the meeting was "called" on the spur of the moment, or did not involve all of Craft's subordinate managers. It was still a meeting called by a vice-president of his subordinates on company time in a company conference room. The evidence should not have been excluded as hearsay; it should have come in as an authorized admission.

*It Was an Abuse of Discretion to Exclude Craft's Statement Under Evidence Code Section 352*

Mitsubishi Electronics next argues that even if the evidence of Craft's statement was admissible, it was properly excluded as an exercise of the trial judge's discretion under Evidence Code section 352. The record does indicate that the trial judge made such a determination. The judge stated he found the evidence "very, very prejudicial with little probative value." Because just the opposite was the case, the discretionary exclusion was an abuse of discretion.

The central problem in the litigation of civil rights claims is the proof of intent. An employer's action may be the result of a sensible and innocent motive—or an invidious one; everything depends on finding out what that motive really was, and that task is often a difficult one. As the United States Supreme Court observed in *U.S. Postal Service Bd. of Govs.* v. *Aikens* (1983) 460 U.S. 711, 716 [103 S.Ct. 1478, 1482, 75 L.Ed.2d 403], "All courts have recognized that the question facing triers of fact in discrimination cases is both sensitive and difficult. . . . There will seldom be 'eyewitness' testimony as to the employer's mental processes."

Given the typical paucity of evidence of clear intent in discrimination claims, it is not surprising that courts have developed an elaborate structure of prima facie cases and shifting burdens so as to ferret out an employer's *true* motive. (See *Texas Dept. of Community Affairs* v. *Burdine* (1981) 450 U.S. 248, 255, fn. 8 [101 S.Ct. 1089, 1094, 67 L.Ed.2d 207] ["In a Title VII case, the allocation of burdens and the creation of a presumption by the establishment of a prima facie case is intended progressively to sharpen the inquiry into the elusive factual question of intentional discrimination."].)

But there is a significant converse of the idea that evidence of clear discriminatory intent is rare and thus much of the time the employer's intent must be extracted through a complicated process of panning and sifting: On those occasions when there *is* evidence of clear discriminatory intent, it is like a gold nugget which just happens to be lying on the ground. You do not throw it away as if it were so much dross. To put the idea in typical evidentiary terms, evidence of clear discriminatory intent is overwhelmingly probative in a discrimination case because it shines a spotlight on the very thing which is the focus of the litigation.

Here, there is no doubt that the excluded evidence was quite damning to the defendant. But the idea that evidence should be excluded because it is "highly prejudicial" to a litigant's case is a classic error. Often the most highly probative evidence is also highly damning, and therefore "prejudicial" in a superficial sense of the word. Evidence Code section 352 does not, however, allow for the exclusion of evidence *merely* because it is "prejudicial" in the sense of damaging to a litigant's position. The relevant phrase from the statute is "substantial danger of *undue* prejudice." (Italics added.) *Undue* prejudice springs from evidence which has " ' "very little effect on the issues." ' " (*People* v. *Minifie* (1996) 13 Cal.4th 1055, 1071 [56 Cal.Rptr.2d 133, 920 P.2d 1337]; *People* v. *Wright* (1985) 39 Cal.3d 576, 585 [217 Cal.Rptr. 212, 703 P.2d 1106] [" 'The "prejudice" referred to in Evidence Code section 352 applies to evidence which uniquely tends to evoke an emotional bias against . . . [one party] as an individual and which has very little effect on the issues.' "].)

*People* v. *Minifie, supra,* 13 Cal.4th 1055 is dispositive on the Evidence Code section 352 issue. In *Minifie,* the defendant was charged with having shot and wounded a patron in a bar. The victim was a big man, but one who was also unarmed and on crutches. After speaking briefly with the defendant, the victim hit the defendant in the face and knocked him down. As he reached back for his crutch, the defendant pulled out a gun and shot him, hitting three fingers. (See 13 Cal.4th at pp. 1061-1062.)

The defendant claimed he acted in self-defense, and proffered evidence that he had received threats from third parties which indicated that a group

of people known as the "Knight family," of whom the victim was a known associate, were out to "get" the defendant for having killed (albeit in self-defense) a member of the Knight family. (See 13 Cal.4th at pp. 1061-1062, 1070.) The trial court concluded that the proffered evidence was inadmissible because the threats came from third parties, and further ruled that even if the evidence were otherwise admissible it would exclude it under Evidence Code section 352. (Thus procedurally, *Minifie* is analogous to the case before us; in both cases the trial court used section 352 as a second line of defense against evidence it deemed inadmissible on a more substantive basis, except that here we have hearsay rather than the relevance of third party threats in the context of self-defense.)

The Supreme Court, however, concluded that it was an abuse of discretion under Evidence Code section 352 to have refused the evidence. It reasoned that the defendant was " 'entitled to present evidence of his circumstances so that the jury could see them from his point of view.' " The proffered evidence was " 'at the heart of the defense' " because it explained what might otherwise be thought to be an overreaction to the threat presented by the bar patron. It presented no risk of undue time consumption or risk of prejudice. (13 Cal.4th at p. 1070, quoting from *People* v. *Wright*, *supra*, 39 Cal.3d at p. 585.)

If it was an abuse of discretion to refuse the evidence in *Minifie*, it was an abuse of discretion to refuse it here. As in *Minifie*, the proffered evidence entailed no undue consumption of time and went to the very heart of the case. Ihara's statement had, moreover, no unique tendency to evoke any "emotional bias" against Mitsubishi (see *People* v. *Minifie*, *supra*, 13 Cal.4th at p. 1071); the only prejudice was, as we have already mentioned, the kind which *inevitably* comes from highly probative evidence of wrongdoing.

And for the same reason there is no ground on which to base a conclusion that the trial court's error in not allowing the evidence was harmless. It went to motive, which is the very core of the case.[3] Its admission thus might have easily made a difference, particularly with regard to the weight and credibility the jury accorded Fukuda's statement. His statement may have been discounted in the jury's deliberations as a mere slip of the tongue or unsupported speculation from someone outside the loop on O'Mary's layoff. The admission of Ihara's statement, however, might have led the jury to accord more credibility to Fukuda's statement and conclude there was, in

[3]Jones had himself been a plaintiff in the case before he died. Obviously the credibility of his testimony was subject to attack for that reason. However, the fact that evidence of clear discriminatory intent is offered by a person whose credibility is subject to attack does not vitiate its value as evidence of clear discriminatory intent.

fact, an articulated company policy to base layoff decisions on an individual's age and not ability to do the job.

## IV

### *The Employee List*

O'Mary claims that a list of employees slated for termination, which included their dates of birth, should not have been excluded. (The document was inadvertently produced during discovery; as soon as the error was discovered Mitsubishi Electronic's counsel demanded it back. The company also brought an *in limine* motion to preclude its introduction into evidence.)

It is undisputed that the list was prepared by Mitsubishi Electronic's manager of human resources at the direction of the company's in-house attorney so he could give legal advice about the upcoming layoffs. It is hard to imagine a document which would more readily fall within the attorney-client privilege. It was prepared at the direction of the company's attorney for an in-house legal evaluation of upcoming layoffs. O'Mary, however, argues that its disclosure in discovery, even if inadvertent, waived the privilege, because "any disclosure that is made without coercion results in a waiver."

O'Mary forgets that discovery *is* coercion. The force of law is being brought upon a person to turn over certain documents. Inadvertent disclosure during discovery by no stretch of the imagination shows *consent* to the disclosure: It merely demonstrates that the poor paralegal or junior associate who was lumbered with the tedious job of going through voluminous files and records in preparation for a document production may have missed something. O'Mary invites us to adopt a "gotcha" theory of waiver, in which an underling's slipup in a document production becomes the equivalent of actual consent. We decline. The substance of an inadvertent disclosure under such circumstances demonstrates that there was no *voluntary* release.

However, we were apprised at oral argument that this same list has also been a topic of litigation in a Minnesota age discrimination case brought against Mitsubishi Electronics. Apparently, the document was ordered produced in that case. It is possible, of course, that it was produced in the Minnesota litigation *ad*vertently and *without* objection, i.e., under circumstances which, unlike those present here, would show a bona fide consensual waiver. Accordingly, on remand the trial court will have the opportunity to determine the exact circumstances of the Minnesota production and decide whether the document may be admitted into evidence based on what has

happened there. Otherwise, on remand the list must still be held privileged and excluded.

V

*The Timeliness of the Motions in Limine*

O'Mary next argues that because his counsel, in contravention of Orange County Superior Court Rules, rule 450 (counsel are to exchange motions *in limine* at issues conference at least 10 days prior to trial) did not receive various motions *in limine* until sometime within the 10 days prior to trial, the court should not have granted any of them. In particular, O'Mary notes that the last-minute deluge of *in limine* motions unfairly hampered his trial preparation. Our determination that the case must be remanded anyway renders this particular argument moot.

However, we are not unsympathetic to O'Mary's point. Trying to win by swamping one's opponent with paper is not an especially commendable litigation practice. (See generally, *People* ex rel. *Dept. of Fish & Game* v. *Attransco, Inc.* (1996) 50 Cal.App.4th 1926, 1938 [58 Cal.Rptr.2d 661].)

VI

*Richard Oliva's Severance Pay*

Richard Oliva is a former Mitsubishi Electronics vice-president who received what O'Mary now claims was a generous severance package when he was terminated in 1991. The trial court precluded inquiry into the nature of that package under Evidence Code section 352, which O'Mary contends to be prejudicial error.

Oliva's severance package related only to Oliva's bias. It had "very little effect" on the main issues in the case, which related to why *O'Mary* was laid off. (Cf. *People* v. *Minifie*, *supra*, 13 Cal.4th at p. 1071.) Any connection with the actual issues in the case was therefore too tenuous for there to be an abuse of discretion.

VII

*Roger Mahnke's Proposed Rebuttal Testimony Concerning Mitsubishi's Practice in the Early 1980's of Finding Employees Replacement Positions*

Roger Mahnke was called as a rebuttal witness to testify that Mitsubishi Electronics had a practice, prior to 1983, of finding employees replacement

positions if their jobs were eliminated. Mahnke had not been listed as one of O'Mary's witnesses. By the time he was called, however, Mitsubishi Electronics had already stipulated that O'Mary could not be terminated without cause. While Mahnke's testimony might have countered the denials of some Mitsubishi Electronics witnesses who denied offering lifetime employment to O'Mary, in light of the stipulation Mahnke's testimony was essentially cumulative. We therefore do not think that the trial court abused its discretion under Evidence Code section 352 in excluding the proffered testimony.

VIII

*Dismissal of the Fraud Action*

The judge properly dismissed O'Mary's fraud action. " '[I]n order to support a claim of fraud based upon the alleged failure to perform a promise, it must be shown that the promisor did not intend to perform at the time the promise was made.' " (*Conrad* v. *Bank of America* (1996) 45 Cal.App.4th 133, 157 [53 Cal.Rptr.2d 336], quoting *Tenzer* v. *Superscope, Inc.* (1985) 39 Cal.3d 18, 30 [216 Cal.Rptr. 130, 702 P.2d 212].) While O'Mary may have been promised lifetime employment in the tradition of Japanese companies at the time, at trial he offered no evidence to show that Mitsubishi Electronics had no intent to perform that promise at the time it was made in the early 1980's. We thus need not address Mitsubishi Electronic's contention that a promise of "lifetime employment" amounts to nothing more than at-will employment anyway.

IX

*The Reduction in Force Instruction*

Mitsubishi Electronics submitted instruction No. 47, which told the jury that if O'Mary was discharged because of a reduction in force necessitated by a decline in business, there was good cause to terminate him. O'Mary contends, in essence, that the instruction was misleading because it would require the jury to find good cause to terminate even where an employer acted discriminatorily, as long as the layoff was the result of a reasonable reduction in force.

In his opening brief, O'Mary quotes only a portion of instruction No. 47, which, if it were taken in isolation, might indeed mislead a jury into thinking that if an employee's layoff was part of a bona fide reduction in force, there

was, ipso facto, no discrimination.[4] Such a statement, of course, would not accurately reflect the law—an employer may very well implement an economically necessary reduction in force and still, at the same time, violate antidiscrimination laws because the *selection* of who is to be laid off is based on some illegal criteria.

O'Mary has, however, omitted the context in which the instruction was given. The instruction was part of a group of jury instructions dealing with O'Mary's breach of contract claim, grounded on his assertion that his employment was terminated without "good cause." The instruction with which O'Mary takes issue was immediately preceded by two other instructions, which set the stage for the good cause issue. The first instruction told the jury that, by virtue of O'Mary's employment agreement not to be terminated except for good cause, his termination had to be for a fair and honest reason. That was followed by an instruction which told the jury that in determining whether there was "good cause," the jury was to "balance the employer's interest in operating the business efficiently and profitably with the interest of the employee in maintaining employment."

Finally, there came the instruction O'Mary now claims was error, but it was preceded by these words (which O'Mary does not quote): "An employer who without good cause terminates a contract of employment that contains an implied agreement that the employee will not be terminated is in *breach of the contract.*" (Italics added.)

It is plain that instruction No. 47 had, *in context*, nothing to do with O'Mary's discrimination claim, and involved only the question of whether Mitsubishi had "good cause" to terminate his employment vis-à-vis his breach of contract claim. Therefore it was not error to give the instruction.

## X

### *The Seniority Instruction*

O'Mary next challenges instruction No. 39, which told the jury that O'Mary was entitled to no better or worse treatment because of his seniority

[4]Here is the text of the instruction as quoted in the brief:

"If you find that the Plaintiff was discharged because of a reduction in force necessitated by a business reorganization or decline in business, you must find that the Respondent [*sic*: the original jury instruction said "defendant"] had good cause to terminate the Plaintiff, so long as the reduction in force was not arbitrary or unreasonable."

in an age discrimination case.[5] O'Mary claims the instruction was error because there was testimony that seniority *was* a factor which Mitsubishi Electronics used in making its layoff selections. He now claims the instruction told the jury to "disregard a large portion of the evidence it heard in trial."

There is nothing wrong with the instruction. Seniority *qua* seniority is not to be simplistically equated with "age" in an age discrimination suit. (*Williams* v. *General Motors Corp.* (5th Cir. 1981) 656 F.2d 120, 130, fn. 17 ["seniority and age discrimination are unrelated. The ADEA targets discrimination against employees who fall within a protected age category, not employers who have employees who have obtained a given seniority status"].)[6]

## XI

### *The Employee Replacement Instruction*

O'Mary also challenges instruction No. 38.[7] There are two parts to the instruction: First, there is an opening sentence which states that the mere fact that a terminated older employee is replaced by a younger worker does not, "in and of itself," raise an inference of age discrimination. Second, there is a paragraph which, in essence, justifies the lack of inference to be drawn from a replacement by a younger worker because of the *general* tendency of older workers to move *out* of the work force and the general tendency of younger workers to move in. O'Mary claims that the instruction misled the jury because it undercut one of the facts it had to consider—whether an

---

[5]Here is the text of the instruction: "Reference is made to Plaintiff's seniority. Seniority is unrelated to whether there has been age discrimination. The seniority a Plaintiff has accumulated entitles him to no better or worse treatment in an age discrimination case."

[6]In his reply brief, O'Mary appears to make the point that the instruction hurt him because it undercut his ability to show pretext. While there is not much elaboration on the point, O'Mary's logic seems to go like this: Mitsubishi said it used three factors to determine who was to be laid off—one of them was seniority, which counted *against* being laid off. Therefore, if O'Mary was laid off *despite* his acknowledged seniority, it must be because, far from his *seniority* counting in his favor, his *age* was really counting against him.

The error in this argument is that it is circular. It implicitly assumes its premise, which is that Mitsubishi Electronics really wanted to get rid of O'Mary because of his age, and uses that premise to show the anomaly of laying off O'Mary despite his seniority counting in his favor.

[7]Here is the text:

"The fact that employees younger than plaintiff were retained or later hired does not, in and of itself, raise an inference of age discrimination. [¶] The progression of age is a universal human process. Even when the employer has no discriminatory intent, it is usually the case during personnel changes that terminated employees more often than not be replaced by those younger than they, because older employees are constantly moving out of the labor market, while younger ones are moving in."

inference should be drawn from replacement by a younger worker—in determining whether he had established a "prima facie" case.

There was no error in the first part. The question of whether a plaintiff has made a prima facie case of age discrimination is not for the jury, but for the judge. (*Caldwell* v. *Paramount Unified School Dist.* (1995) 41 Cal.App.4th 189, 201 [48 Cal.Rptr.2d 448].) Inherent in the very fact that the case got to the jury at all was that the evidence established a prima facie case. The only thing that the "in and of itself" language did was tell the jury that it should not draw any inference from just *one* of the elements of a prima facie case. Replacement by a "nonprotected" worker is only one part of a prima facie case. For example, not only must the replacement come from a nonprotected category, but the claimant must show that the replacement had similar qualifications. (See *Levy* v. *Regents of University of California* (1988) 199 Cal.App.3d 1334, 1343 [245 Cal.Rptr. 576].) Given that civil rights law allows a prima facie case to be based on "very little" evidence (see, e.g., *Wallis* v. *J.R. Simplot Co.* (9th Cir. 1994) 26 F.3d 885, 889; *Sischo-Nownejad* v. *Merced Community College Dist.* (9th Cir. 1991) 934 F.2d 1104, 1110-1111), it would have been unfair to Mitsubishi Electronics to have allowed the jury to have drawn an inference of discrimination from only one of the elements of a prima facie case.

But just because replacement with a younger worker is not enough, by itself, to constitute age discrimination does not mean that it cannot, in conjunction with other factors, help show age discrimination. The second part of the instruction, however, unfairly minimized O'Mary's ability to make use of the replacement factor by dismissing its importance altogether. It did so by suggesting that replacement of older workers by younger workers is simply the normal course of events.

It may be true, as a general rule, that older workers *tend* to move out of labor markets while younger workers tend to move in. But the application of stereotyped generalities to individual human beings is precisely the evil at which the age discrimination laws are aimed. (*Hazen Paper Co.* v. *Biggins*, *supra*, 507 U.S. at pp. 610-611 [113 S.Ct. at p. 1706].) For example, as a *statistical* matter eyesight tends to decline with age. So what? It does not follow, from that generality, that a professional pilot who was perfectly capable of doing his or her job at age 59 must be retired upon turning 60. It is the great wonder of the late 20th century that age stereotypes are constantly confounded, including on the very point involved in the jury instruction. Anybody who knows a person in his or her early 20's who has quit work to go to college, or who knows a person in his or her 70's who has just graduated from college and wants to begin work or change careers, knows

that the generality, enshrined in instruction No. 38, that "terminated employees will more often than not be replaced by those younger than they because older employees are constantly moving out of the labor market while younger ones are moving in" is just that—a generality. Demographic generalities about the labor market do not show whether a particular employer acted with a "discriminatory intent" in a particular case. The key is whether there was discriminatory intent in taking action in a specific case, not what is *generally* true.

The second part of the instruction was taken from a portion of a footnote in a federal case (*Laugesen* v. *Anaconda Company* (6th Cir. 1975) 510 F.2d 307, 313, fn. 4), which, in context, was contrasting age discrimination law with race discrimination law. The court was suggesting that the two cannot be readily equated. In cribbing from the footnote, the instruction omitted these crucial, qualifying words: "In the very nature of the problem, it is apparent that in the usual case, absent any discriminatory intent . . . ." (*Ibid.*) Those words, at least, would have refocused the jury's attention on the peculiar facts of the case. Even so, the generalities of who enters and who exits the labor market were irrelevant. It was error to give the second part of the instruction. On remand, the paragraph of instruction No. 38 which begins with "The progression of age . . ." should be dropped.

## XII

### *O'Mary's Instruction on the Burden of Proof*

O'Mary contends that the trial court erred in refusing his proposed instruction No. 4.1, and instead gave a pattern instruction taken from a federal jury practice form book.[8] O'Mary's instruction was admirably simple and straightforward. Essentially, it told the jury that if it found by a preponderance of the evidence that age was "a motivating factor in the defendant's decision to discharge him," he won. Period.[9]

---

[8]The book is 3 Devitt et al., Federal Jury Practice and Instructions (4th ed. 1987).

[9]Here is the complete text of what O'Mary proposed:

"Plaintiff has the burden of proving each of the following by a preponderance of the evidence:

"(1) the plaintiff was discharged;

"(2) the plaintiff was 40 years of age or older at the time of discharge; and

"(3) the plaintiff's age was a motivating factor in the defendant's decision to discharge the plaintiff.

"If you find that each of these things has been proved against a defendant, your verdict should be for the plaintiff and against the defendant. On the other hand, if any of these things has not been proved against a defendant, your verdict should be for the defendant."

The instruction given, by contrast, contained a paragraph which told the jury, essentially, that even if there was evidence from which the jury "could" conclude that O'Mary's discharge was because of his age, Mitsubishi could *still* show that it "had a reason other than age" for its actions.[10]

As between the competing instructions, the one chosen by the judge, while more complex, was clearly superior in the context of this case. We must return again to the distinction, which worked in O'Mary's favor earlier in this opinion, between a *company policy* and evidence that the reason for a *particular* discharge was illegal. It does not follow, as a matter of law, that Mitsubishi *necessarily* terminated O'Mary's employment because of age in the wake of Fukuda's (and, on remand, Ihara's and Kawasaki's) statements of benighted corporate policy. Perhaps the decision to lay off O'Mary had nothing to do with his age. While the jury would certainly be reasonable in presuming that O'Mary was laid off because of his age, that presumption could be rebutted by Mitsubishi Electronics. After all, employees do not always implement corporate policy. They may not know about it; sometimes they even ignore it. O'Mary's proposed instruction would have unfairly stripped Mitsubishi Electronics of its ability to rebut the inference created by Fukuda's statement.

## XIII

### *Undue Repetition and Emphasis*

O'Mary ends his opening brief with a two-paragraph comment that "[m]any" of Mitsubishi's jury instructions were repetitive and unduly emphasized the defense side of the case. By not specifying any concrete examples he has not presented any argument which may be meaningfully examined on appeal.

[10]Here is the complete text of the instruction the judge gave:

"Under California law it is unlawful for an employer to discharge an employee because of that employee's age when the employee's age is 40 or over. In order to prevail on his claim, the plaintiff must prove by a preponderance of the evidence:

"First, that he was within the protected age group; that is, he is 40 years of age or older; second, that he was discharged from his employment; and third, that the plaintiff's age was one of the reasons that prompted the defendant to take the action.

"When plaintiff has offered evidence from which you could conclude that the defendant discharged him because of his age, defendant may show that he had a reason other than age for his actions.

"In order for you to find for the plaintiff, you must find, from all of the evidence, that the plaintiff's age was a determining factor in the decision of the defendant to discharge him; that is, defendant would not have made its decision except for plaintiff's age. However, plaintiff's age need not have been the only reason."

## XIV

### *Conclusion*

The judgment is reversed, and the case remanded to the trial court. On retrial, the court is directed to admit the evidence of vice-resident Craft's statement of corporate policy as articulated by Ihara and concurred in by Kawasaki, and to delete the second portion of jury instruction No. 38, which could be potentially misleading to a jury. O'Mary is to recover his costs on appeal.

Wallin, J., and Crosby, J., concurred.

A petition for a rehearing was denied December 22, 1997, and respondent's petition for review by the Supreme Court was denied February 18, 1998.