Filed 6/5/24  Jacobs v. City and County of San Francisco CA1/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

### FIRST APPELLATE DISTRICT

### DIVISION THREE

| | |
|---|---|
| LARRY JACOBS,<br><br>          Plaintiff and Respondent,<br><br>v.<br><br>CITY AND COUNTY OF SAN FRANCISCO,<br><br>          Defendant and Appellant. | A167220<br><br>(San Francisco City & County Super. Ct. No. CGC-20-586245) |

Larry Jacobs, a firefighter, sued the City and County of San Francisco (the City) claiming it denied him employment opportunities in retaliation for filing a prior racial discrimination lawsuit against the City.  A jury returned a verdict in favor of Jacobs, awarding him a total of $725,000 for past and future economic and noneconomic losses, and the trial court entered judgment after rejecting the City's equitable defenses in a bench trial.  The City moved for judgment notwithstanding the verdict and for a new trial, but the court denied the motions.

On appeal, the City argues:  (1) the jury's economic damages award is excessive and unsupported by substantial evidence; (2) the City did not receive a fair trial due to the trial court's evidentiary rulings and misconduct by Jacobs's counsel; and (3) substantial evidence does not support the jury's finding that Jacobs was denied an acting arson investigator position in

1

retaliation for protected activity. We conclude the evidence is insufficient to support the jury's award of economic damages. Accordingly, we reverse that portion of the judgment, but in all other respects we affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

### A. The Trial

In August 2020, Jacobs filed this suit against the City alleging causes of action for whistleblower retaliation in violation of Labor Code section 1102.5, and for retaliation in violation of Government Code section 12940 (Fair Employment and Housing Act or FEHA).

At all relevant times beginning in May 2005, Jacobs worked as a firefighter (civil service classification H-2) for the San Francisco Fire Department (the Department). Since 2008, he has consistently sought appointment as an "Arson Investigator" (civil service classification H-6), and this lawsuit contended he was impermissibly denied such a position around October 2017 and April 2018. Jacobs, who is African American, claimed the Department denied him the H-6 position in retaliation for his exercise of protected activity in suing the City in 2011 for racial discrimination and in 2014 for complaining about black mold in a fire station. A jury trial was held over several days in March and April 2022. The following is a summary of the trial testimony.

#### 1. Jacobs's Case

To prove his claims of retaliation, Jacobs offered the following testimony to show that he complained about the City's discriminatory conduct and that he reasonably believed the City's conduct was unlawful. He described mistreatment that he experienced early in his career as an H-2 firefighter, which began in May 2005. In short, at his first assignment as a trainee at the Department's academy, he injured his shoulder and was

2

assigned to light duty at a training facility on Treasure Island for about eight months, where he had to clean bathrooms with a toothbrush and sweep the eight-acre facility with a "fishtail brush and a dustpan." Others at the training facility referred to him as "cleaning boy" or "house boy." Afterwards, he was placed in a "mini academy" where his instructor hit him in the head with a tool. At a subsequent assignment, he was told he was not passing a test, even though he believed he was. It was not until he had a member of the Black Firefighters Association[1] film him taking the test that the Department finally passed him.

After experiencing this mistreatment, Jacobs asked then-Chief of the Department, Joanne Hayes-White, for an apology in his file and training for the Chief of Training, but the Chief declined the request. In 2011, he sued the City for racial discrimination, and in 2013, the parties settled for $175,000. Jacobs also lodged a complaint with the City regarding black mold at a station house on Treasure Island, after he began working there in 2009.

Jacobs gave the following testimony to establish his ongoing efforts to become an H-6 arson investigator, i.e., a peace officer who investigates the causes of a fire and testifies as an expert in court. In 2008, Jacobs took various classes and a test and was placed on a 2008 eligibility list for the position. As part of the application process, he certified that he had responded to at least 100 fires, a prerequisite for the position. Around the time he settled his prior lawsuit, Jacobs was contacted regarding a possible arson investigator position. He took a background test and psychological examination, but was ultimately told he did not "meet their expectations."

---

[1] The Black Firefighters Association is an employee organization within the Department promoting fire prevention, recruitment of people of color, and education and equality.

3

When the 2008 list expired, Jacobs took the examination again and was placed on the 2014 eligibility list. Because he previously documented that he responded to 100 fires, he did not need to resubmit that information.

In August 2016, Fire Marshal Rich Brown inquired about Jacobs's interest in an "acting assignment" doing community outreach for the arson unit.[2] Brown indicated the job was focused on fire prevention and public outreach, not arson investigation. The position was a "days" position, meaning the person would work four to five days a week, rather than the 24-hour shifts nine times per month that H-6 arson investigators work. Brown told Jacobs that non-acceptance of the job would not impact his ability to become an arson investigator, as the Chief "goes down [the eligibility list] in rank order."[3] Jacobs turned down the acting assignment, which Janet Brock—who was lower on the eligibility list than him—accepted.

In June 2017, Fire Marshal Dan de Cossio called Jacobs and asked if he was interested in an acting community outreach position that would include some "arson components." Jacobs said he would accept the position and was excited. When Jacobs asked why the position was open, de Cossio indicated the Chief was moving Brock into an acting 24-hour H-6 arson investigator position. Because Brock was below him on the eligibility list, Jacobs wrote a letter to Chief Hayes-White accepting the community outreach position while

---

[2] We note here the significant distinction between an *acting* assignment and a *permanent* civil service appointment. Within the Department, the terminology is that one "owns" their permanent position. However, a person in an acting assignment fills a position temporarily, though a person can stay in an acting position for a lengthy period. When an acting position ends, the person in the acting position returns to their permanent civil service position. An acting assignment is not an appointment to another classification.

[3] Rank order on an eligibility list simply means the order one appears on the list, which is determined by score.

4

also urging that the arson investigator position should be given to persons on the eligibility list in rank order. Jacobs's letter stated: "The person who was doing the Arson Outreach Position was below me on the Eligibility List. As an African American, who has been involved in a legal dispute with the San Francisco Fire Department and received a six-figure settlement and has been mentioned in other legal disputes and investigations which have reached tentative six-figure settlements, I would hope that this is an inadvertent mistake and not Retaliation for past actions and events."

Chief Hayes-White responded by explaining that an arson investigator was choosing to be re-assigned to fire suppression duties, that Brock had served as an arson investigator on an as-needed basis in her community outreach position, and that therefore it was logical to give Brock the acting assignment as a 24-hour arson investigator, which was not a permanent civil service appointment. Hayes-White further explained that although she usually makes selections in rank order from eligibility lists, the Civil Service Rules do not preclude selections out of order. She also indicated that Jacobs was not up next on the list for an H-6 position. Ultimately, Jacobs never heard from de Cossio or about the community outreach position again. Later Jacobs learned the position had been reclassified to a fire inspector position (civil service classification H-4) and filled by firefighter Tomie Kato. Though Jacobs would have taken the job if it had been offered to him, he admitted he was not on the H-4 eligibility list and had not expressed any interest in an inspector position.

In April 2018, Assistant Fire Marshal Tyrone Pruitt asked Jacobs if he would be interested in an H-6 position as an acting 24-hour arson investigator and Jacobs said he was. Pruitt told Jacobs he was only canvassing the list for interest, and Jacobs was the highest-ranked person

5

who expressed interest in that particular position. After talking with Pruitt, the Department never filled the position. In 2020, Jacobs asked Pruitt if the Department knew he was up for the position in 2018. Pruitt said yes, and that once Jacobs's name was mentioned and went up the chain, the position went away.

Around October 2021, after a new eligibility list was released, Jacobs was again asked about his interest in an H-6 arson investigator position. Jacobs responded affirmatively, and the Department arranged a background check and psychological examination. But Jacobs was removed from the eligibility list for allegedly not meeting the 100-fire requirement for the H-6 position. At the time of the instant trial, Jacobs was in the midst of his appeal to the Civil Service Commission regarding his removal from the H-6 list, maintaining he met the 100-fire requirement in 2008, 2014, and 2018.

As a result of the Department's treatment of him, Jacobs mistrusts the Department's administrators. He does not sleep in the fire house, he is on edge, and has headaches and night sweats. He does not see any healthcare providers for his emotional distress, but he has gotten bite guards from his dentist.

Former Fire Marshal Dan de Cossio testified as follows. De Cossio worked for the Department from 2001 to 2021. As Fire Marshal, he oversaw the Bureau of Fire Prevention, where inspectors work, and the Bureau of Fire Investigation, where H-6 arson investigators work. Inspectors work four ten-hour days, while H-6 arson investigators work 24-hour shifts. To become an investigator, one must undergo "CLETS" screening, a background check, and a psychological evaluation, which takes four to eight weeks. The arson unit is small, consisting of nine or less investigators, two per shift. The standard practice for appointing or assigning people to permanent and acting positions

6

was to go in rank order from an eligibility list. The Chief is the sole hiring authority in the Department, and when a position opened, de Cossio's role was to ascertain who was interested then communicate that to the Chief.

Apart from H-6 arson investigators, there initially was a community outreach position with an H-6 civil service classification. The Department originally intended for one H-4 fire inspector and one H-6 arson investigator to team up for community outreach and deliver public education and safety talks. Over time, de Cossio believed it would make more sense to unify the community outreach team in a shared workspace with a shared supervisor. Thus, around September 2017, the H-6 community outreach position was reclassified to a second H-4 position. De Cossio did not personally know or recall speaking with Jacobs, and he did not think about Jacobs when reclassifying the community outreach position. In October 2017, Brock lost the reclassified community outreach position, and she began an assignment as an H-6 in the "youth fire setter program," which was a temporary position funded by a federal grant for about one year.

In November 2018, the firefighter's union filed a grievance about staffing in the arson unit. Specifically, the grievance concerned the H-6 arson investigator position vacated by Robert La Eace, who left to work as an acting H-22 Fire Prevention Lieutenant. De Cossio did not think the arson unit needed additional staff but there was an ongoing conversation about staffing. While the grievance was pending, de Cossio wrote an email to Jesusa Bushong, a human resources person for the Department, stating that if they were going to backfill for La Eace, they should do so in order on the eligibility list.

Connie Richards, Jacobs's friend, testified she was present when Jacobs was accepting a job on the phone in 2017. The call was on speakerphone, and Richards heard Jacobs and a man discuss things like start dates.

John Darmanin testified as follows. He became captain of the arson unit in mid-2014. At the time, there were only about five arson investigators and an enormous workload. He recalled requesting work relief in 2015 for the existing investigators from then-Deputy Chief and second in command, Mark Gonzales. While acting assignments and vacation relief were being discussed, Jacobs's name came up as they reviewed the new eligibility list. Gonzales commented that Jacobs was a "shit disturber" with a lawsuit against the City, and said something to the effect of not wanting "that kind of trouble down at arson." Gonzales authorized persons on the list below Jacobs to do vacation relief for the arson unit. Darmanin had no role in staffing by late 2015, and he eventually retired in 2016.

Chief Hayes-White testified as follows. As Chief of the Department, she made all appointments and assignments, and generally followed eligibility lists in doing so. With regard to acting assignments, she followed the eligibility lists at least half of the time. She knew Jacobs had a reputation for honesty and credibility, but she was not familiar with his work performance. She recalled he filed a lawsuit against the Department in 2011 and vaguely remembered it had to do with his experiences as a trainee. After Jacobs's prior case settled, Hayes-White took steps to ensure everyone in the Department was treated fairly. The head of the Division of Training at the time of Jacobs's allegations, however, was promoted to Division Chief. When asked if this sent the right message, Hayes-White responded that people are disciplined but given another chance if they have demonstrably changed.

Chief Hayes-White testified Brock was assigned an acting H-6 position with community outreach in 2016, but was not appointed to a permanent civil service position. Aside from that acting assignment, which was funded by an outside department, Brock served in two other acting or temporary H-6 assignments: (1) for about six to eight weeks, she temporarily filled in for arson investigators working 24-hour shifts on an as needed basis; and (2) she took a short-term juvenile fire setters position, which was funded by a federal grant.[4] When Brock temporarily filled in for a 24-hour arson investigator, that was not a decision made by the Chief, most likely because it was a short-term coverage decision. Hayes-White did not recall using the eligibility list to fill the juvenile fire setters position, but believed she discussed it with de Cossio and probably agreed with his recommendation. Jacobs's prior lawsuit played no role in the decision.

Chief Hayes-White indicated that in 2018 the firefighters' union filed a grievance concerning the Department's decision not to fill an H-6 arson investigator position. She did not recall that Pruitt canvassed the H-6 eligibility list or know that Jacobs was at the top of the list. But she indicated she decided not to fill the position because of budgetary constraints and because staffing at eight investigators was adequate. Jacobs's prior lawsuit played no role in her decision not to fill the spot.

Chief Hayes-White recalled and agreed with de Cossio's recommendation that the community outreach team be staffed by two inspectors rather than an investigator and an inspector. Jacobs never came

---

[4]     The juvenile fire setters position did community outreach dealing with young arsonists.

Brock's work history with the Department from 2016 onward was introduced into evidence. It shows Brock worked 24-hour shifts from June 9, 2017 to July 28, 2017. But by late October 2018, Brock went on leave and never returned to work thereafter.

up in that discussion. Hayes-White did not recall ever having a conversation with Mark Gonzales about Jacobs in a temporary or acting assignment, much less Gonzales telling her not to give Jacobs an acting assignment.

Tyrone Pruitt testified as follows. Around April 2018, when he was an Assistant Fire Marshal, he canvassed the H-6 eligibility list for people interested in an acting arson investigator position and reported the information he gathered to de Cossio. Jacobs expressed interest, and Pruitt indicated that Jacobs was the top-listed person who expressed an interest in accepting a possible acting position. Pruitt pushed for the position to be filled on behalf of the existing investigators, but the Department never filled it.

Other witnesses testified, among other things, that they too had sued the Department and were later denied promotions, that Jacobs was a model firefighter, that he kept to himself during the process of trying to become an arson investigator, and that he seemed more depressed from 2016 to 2018.

Based on this record, Jacobs alleged he was denied promotion to the following positions: (1) the 24-hour acting arson investigator position to which Brock was assigned in the summer of 2017; (2) the acting community outreach position that de Cossio allegedly offered him in June 2017; (3) the temporary H-6 juvenile fire setters position that Brock assumed in October 2017 after her community outreach position was reclassified; (4) the acting arson investigator position for which Pruitt canvassed in April 2018; and (5) the arson investigator position he was asked about in 2021.

Jacobs presented an "economic loss" expert to testify about the economic losses he incurred from being denied a promotion. She calculated the value of his past loss for earnings from an October 2017 promotion denial to the date of trial to be $100,719.14, the present value of future losses from the time of trial to the expected retirement date to be $241,883.12, and the

present cash value of lost future retirement benefits to be $380,769.02. In making her calculations, the expert relied on statistical analyses regarding work life expectancy and life expectancy. In calculating lost earnings, she assumed that Jacobs would have been promoted to a 24-hour H-6 arson investigator position as of October 20, 2017, and that Jacobs would have worked for roughly nine and a half more years in that position.

### 2. *The City's Case*

Mark Corso, Deputy Director of Finance and Planning at the Department, testified as follows. He recalled that de Cossio reclassified the H-6 community outreach position to an H-4 position, but did not recall that Jacobs's name came up as part of the discussions. As for the late 2018 union grievance seeking to fill a ninth arson investigator position, Corso indicated the workplace was in a state of transition and uncertainty because Chief Hayes-White had announced her retirement and many big decisions about staffing were being deferred until a new chief was appointed.

Concerning eligibility lists, Corso indicated that when a person has an acting assignment under a prior list and a new list comes out, the person loses their acting assignment to whoever is higher on the new list. A new H-6 eligibility list came out in 2019, and in late December 2019, Chief Jeanine Nicholson made her first appointments from the 2019 H-6 eligibility list. Corso, who does not know Jacobs, never heard Jacobs's name mentioned in connection with any staffing decisions about H-6 investigators in 2017, 2018, or 2019.

Tomie Kato, an acting H-4 inspector in the community outreach program, testified arson has had no role in that program since she started working in it in October 2017. Kato was not on the H-4 eligibility list, but she applied and obtained her acting H-4 assignment pursuant to a July 2016

11

general order by Chief Hayes-White indicating that various other permanent civil service classifications could apply for an acting H-4 inspector assignment.

Chief Nicholson testified as follows. She became chief in May 2019, about a month after the 2019 H-6 eligibility list came out. In December 2019, she used the new list to make appointments in rank order. Even if Jacobs had been in an H-6 acting assignment when this new list came out, he would have been removed from the acting assignment because he was near the bottom. It is Chief Nicholson's practice to run a fire history report for everyone on the list, and she had her staff run Jacobs's fire history report. Nicholson testified it is important that arson investigators have experience responding to a significant number of fires because they have to testify in court and so must be subject matter experts.

Steve Ponder, who works for the City's central human resources department, testified concerning the wages earned by a firefighter such as Jacobs who is classified at the top step of the H-2 classification, versus an H-6 classification (which has no steps). An H-6 made roughly $24,000 more than an H-2 during the 2017-2018, 2018-2019, and 2019-2020 fiscal years. Further, from October 30, 2017 to November 30, 2018—i.e., a period of 13 rather than 12 months—the H-6 juvenile fire setters position earned $25,670.67 more than an H-2 firefighter, and the 24-hour H-6 investigator position that went unfilled in 2018 would have earned $24,011 more than an H-2 firefighter. An H-2 firefighter in an acting H-6 assignment would be compensated as an H-6, and Ponder did not believe there was any limit on how long a person can serve in an acting assignment.

## B. The Jury's Verdict and Bench Trial on Equitable Defenses

The jury returned a verdict in Jacobs's favor, although two of the twelve jurors found against Jacobs on his retaliation claim. With regard to his FEHA claim, the jury concluded that the City did not assign Jacobs to a position as an arson investigator after March 31, 2018, and that Jacobs's complaints of discrimination were a substantial motivating reason for the City's decision.[5] As for the Labor Code claim, the jury concluded that Jacobs disclosed a violation of law, that the disclosure contributed to the City's decision to not assign Jacobs to an arson investigator position, and that the City would not have otherwise denied Jacobs the assignment for legitimate, independent reasons. The jury also found that Jacobs had responded to 100 fires by December 31, 2008. The jury awarded Jacobs a total of $725,000 in damages, as follows: $83,000 for past lost earnings; $242,000 for future lost earnings; $190,000 for future lost retirement benefits; $70,000 for past noneconomic loss including mental suffering; and $140,000 for future noneconomic loss including mental suffering.

In August 2022, the trial court held a bench trial concerning the City's claimed affirmative defenses of after-acquired evidence and unclean hands. These defenses were premised on the City's allegation that Jacobs lied about meeting the 100-fire requirement. The court ultimately rejected these defenses. Though it believed it was not bound by the jury's 100-fire finding, the court agreed with and adopted the jury's finding. The court noted the City had not produced reliable evidence to support the defenses, had not proved it had a settled policy of making promotions contingent on whether a

---

[5] Because of the governing statutes of limitations, the jury was limited to considering Jacobs's promotional denials after March 31, 2018 for the FEHA retaliation claim, and to August 20, 2017 for the whistleblower retaliation claim.

firefighter in fact had responded to 100 fires, and had no clear definition of what it meant to respond to 100 fires. The court further found the equities favored Jacobs—who succeeded in having the Civil Service Commission reinstate him to the H-6 eligibility list—and not the City, which did not provide clear instruction as to how the 100 fires question should be interpreted. In October 2022, the court entered a judgment awarding Jacobs $725,000.

### C. The Motions for Judgment Notwithstanding the Verdict and New Trial

The City moved for judgment notwithstanding the verdict arguing: (1) substantial evidence did not support the jury's finding that Jacobs's 2011 lawsuit was a contributing factor in the Department's decisions; (2) the City proved by clear and convincing evidence that it would have made the decisions at issue for legitimate and independent reasons; and (3) substantial evidence did not support the jury's economic damages award. Alternatively, the City moved for a new trial, arguing: (1) the weight of the evidence was contrary to the jury's finding that Jacobs's 2011 lawsuit was a contributing factor to the Department's decisions; (2) the trial court erred in admitting evidence; (3) the jury's damages award was excessive and unsupported; and (4) misconduct by plaintiff's counsel and the court's erroneous evidentiary rulings prevented the City from receiving a fair trial. The court denied the motions, and this appeal followed.

### DISCUSSION

### A. Economic Damages

The City contends the economic damages award—$83,000 in past lost earnings, $242,000 in future lost earnings, and $190,000 in future lost retirement benefits—was unsupported by substantial evidence and excessive. The City argues Jacobs's expert based her calculations on the false

14

assumption that Jacobs could have been appointed on October 20, 2017 to a *permanent* civil service position as an H-6 arson investigator with a 24-hour shift schedule and would have remained in that position until 2031. But the 2017 and 2018 H-6 assignments at issue were *acting* assignments with specific and foreseeable end dates. That is, the juvenile fire setters position ended in November 2018 and had a 40-hour per week schedule rather than a 24-hour shift schedule, which even the expert conceded would change her analysis. And the 2018 H-6 acting assignment that the Department elected not to fill would have, in any event, ended for Jacobs with the release of the 2019 eligibility list. Thus, the City argues, Jacobs's economic damages should be, at most, $49,681.67—i.e., the difference in salary between the juvenile fire setters position and an H-2 firefighter between October 2017 to November 2018, plus the difference in salary between the unfilled 24-hour H-6 position and an H-2 firefighter from April 2018 to May 2019.

Code of Civil Procedure section 657, subdivision 5, allows a trial court to vacate or modify a verdict or grant a new trial when the awarded damages are excessive. On review of an order denying a new trial for damages, " ' "[w]e do not reassess the credibility of witnesses or reweigh the evidence. To the contrary, we consider the evidence in the light most favorable to the judgment, accepting every reasonable inference and resolving all conflicts in its favor." ' " (*Atkins v. City of Los Angeles* (2017) 8 Cal.App.5th 696, 737–738 (*Atkins*).) We will conclude " ' "[t]he evidence is insufficient to support a damage award only when no reasonable interpretation of the record supports the figure." ' " (*Id*. at p. 738.)

"A damage award must not be ' " 'speculative, remote, imaginary, contingent, or merely possible.' " ' [Citations.] Courts reviewing damages for the loss of future earnings have held such damages are recoverable ' " 'where

15

the evidence makes reasonably certain their occurrence and extent.' " ' [Citations.] Indeed, '[d]amages must, in all cases, be reasonable.' [Citations.] Requiring the plaintiff to prove future economic losses are reasonably certain 'ensures that the jury's fixing of damages is not wholly, and thus impermissibly, speculative.' " (*Atkins*, *supra*, 8 Cal.App.5th at p. 738.) "An expert's testimony about a plaintiff's earning capacity must be grounded in reasonable assumptions [citation], not speculative or conjectural data [citations]. If the expert's opinion is not based on facts otherwise proved or if the opinion assumes facts contrary to the evidence, 'it cannot rise to the dignity of substantial evidence.' " (*Id.* at p. 740.)

Here, Jacobs's economic loss expert assumed that Jacobs could have been appointed to a 24-hour H-6 arson investigator position on October 20, 2017 and that he would have remained in that position until his prospective retirement in 2031. But our review of the record reveals there was no substantial evidence indicating Jacobs could have been appointed to a 24-hour H-6 arson investigator position for that duration of time. As the City points out, it was undisputed that both the 2017 and 2018 H-6 assignments at issue were *acting* assignments with specific and foreseeable end dates.

In Jacobs's view, substantial evidence supports the economic damages award. Specifically, he points to the evidence that when Assistant Fire Marshal Pruitt asked about his interest in an H-6 position in April 2018, Jacobs was the highest-ranked person on the eligibility list who expressed interest in that particular position, and the evidence demonstrated that the position was never filled though there was " 'urgent' " need to fill it.[6]

---

[6] The unfilled H-6 acting position for which Assistant Fire Marshal Pruitt canvassed in April 2018 is the only position that Jacobs mentions in his appellate brief when arguing that substantial evidence supports the economic damages award.

But again, a review of Pruitt's testimony makes clear that the unfilled H-6 position was only an *acting* assignment. Pruitt indicated the position was a vacancy created by an investigator getting another acting assignment, more specifically, by investigator La Eace being appointed as an acting H-22 lieutenant. Chief Nicholson testified that had Jacobs been serving in an acting H-6 assignment when the 2019 eligibility list came out, his placement near the bottom of that list meant he would have been removed from the acting assignment. And the record confirms that Nicholson made appointments and assignments in rank order from the 2019 eligibility list in December 2019.

Apart from Pruitt's testimony, Jacobs cites no evidence showing that this unfilled H-6 position was a permanent one, and our review of the record discloses none. Though Jacobs seems to acknowledge the lack of such evidence, he contends as follows: "[The City] argues that the job was not permanent, and that even if Jacobs had been appointed to it, he would have been removed when a new eligibility list was created and openings were filled

---

With regard to the community outreach position that de Cossio allegedly offered Jacobs in 2017, testimony from both Chief Hayes-White and Jacobs himself, as well as other evidence, established that: (1) the community outreach position was an acting position, and (2) Janet Brock— who rightfully obtained the community outreach position because Jacobs turned it down the year prior—merely backfilled for an arson investigator for a few weeks around the summer of 2017, and returned to the community outreach position in July 2017. Further, it was uncontested that when Brock was assigned to cover for an arson investigator, a number of H-2 firefighters were ahead of Jacobs on the H-6 eligibility list and he would not have obtained a 24-hour H-6 investigator position at this time.

Finally, the juvenile fire setters position that Brock obtained in late 2017 was a grant-funded position which lasted for only about one year. Like the community outreach position, it was a "days" position (i.e., a 40-hour per week schedule) rather than a 24-hour shift schedule, which Jacobs's expert conceded would change her analysis.

17

from it.  That is the general rule.  *However, the trial evidence demonstrated that individuals appointed to positions on a temporary basis could be moved into permanent status if they were qualified for appointment, and a permanent position became open.  It was within [the City's] discretion to move Jacobs from a temporary appointment into a permanent one*, provided both that the vacancy existed in an authorized permanent position and that the Department filled it prior to the effective date of a new civil service list. [¶] For example, Tomie Kato was appointed to an H-4 fire inspector position on an acting basis in October 2017.  [Citation.]  She was promoted to the position on a permanent basis in 2021.  [Citation.]  Tyrone Pruitt was appointed as an acting lieutenant, next a provisional lieutenant, and then a permanent lieutenant in fire prevention."  (Italics added.)

This is unpersuasive.  First of all, to the extent Jacobs is suggesting that the Department could have, or would have, appointed him from an acting assignment to a permanent civil service position out of rank order, Jacobs provides no record citation to support that premise.  His examples do not bolster his position.  Kato and Pruitt testified they received promotions to permanent classifications after acting in those classifications, but there was no evidence suggesting they were promoted to permanent classifications out of rank order.  Pruitt—among others—testified that promotions to permanent positions are made from the eligibility list in rank order.  With the exception of one incident, Pruitt indicated he had never known of someone getting an assignment or promotion out of rank order unless the person above them declined the position.  Though Jacobs contends it was within City's discretion to move him "from a temporary appointment into a permanent one, *provided both that the vacancy existed in an authorized permanent position and that the Department filled it prior to the effective date of a new civil service list*"

18

(italics added), Jacobs fails to cite evidence showing that a permanent H-6 position actually existed between the time when Pruitt canvassed the eligibility list in April 2018 and when the new eligibility list became effective in April 2019.[7]

Jacobs argues the City "wrongly assumes that Jacobs's appointment would not have become permanent prior to the establishment of a new civil service eligibility list." But Jacobs only speculates that the unfilled 2018 acting appointment might have become permanent and that this might have happened before the new eligibility list came out.

" '[A] judgment may be supported by inference, but the inference must be a reasonable conclusion from the evidence and cannot be based upon suspicion, imagination, speculation, surmise, conjecture or guesswork. [Citation.] Thus, an inference cannot stand if it is unreasonable when viewed in light of the whole record.' " (*McRae v. Department of Corrections & Rehabilitation* (2006) 142 Cal.App.4th 377, 389–390 [factfinders " ' "may not believe impossibilities" ' "].) After due consideration of the entire record, we conclude the economic damages award is unsupported by substantial evidence.[8] Consequently, the judgment awarding economic damages must be

---

[7] At oral argument, Jacobs belatedly claimed that trial exhibit no. 49 proved there would be an additional vacant permanent H-6 position in late 2018. Not only has Jacobs failed to provide a record cite for this exhibit, but his appellate briefing made no mention of the exhibit or its supposed significance. In any event, the record contains no evidence that Jacobs would have been at the top of the eligibility list in late 2018 for a new permanent civil service appointment. Though Pruitt told Jacobs in 2018 he was the highest-ranked person on that eligibility list *to express interest in the acting position that Pruitt was canvassing about*, this was not evidence that Jacobs was the highest-ranked person who sought *a permanent H-6 investigator position*.

[8] In concluding otherwise, the trial court suggested that Jacobs might have remained in an *acting* H-6 assignment. Jacobs does not make this

reversed, and a new trial on economic damages is warranted. (Code Civ. Proc., § 657, subd. (5).)

We note the City's reply brief requests that, if we conclude there was sufficient evidence that Jacobs was denied an acting assignment in April 2018, we consider reducing the award of past economic damages to $24,011 (i.e., the salary difference between a top-step H-2 position and the unfilled 24-hour H-6 assignment from 2018 to 2019). While the evidence may be sufficient to show that Jacobs was denied an acting H-6 assignment at least from April 2018 to December 2019, the City cites no authority indicating we can simply alter the jury's damages award under the circumstances here. " ' "The measure of damages suffered is a factual question and as such is a subject particularly within the province of the trier of fact." ' " (*Atkins*, *supra*, 8 Cal.App.5th at p. 742.)

## B. Deprivation of a Fair Trial

Next, the City argues it did not receive a fair trial due to various erroneous evidentiary rulings and misconduct by Jacobs's counsel during closing argument. We discuss these claims in turn below.

### 1. The Allegations Underlying Jacobs's Prior Lawsuit

First, the City complains that Jacobs was permitted, over its objections, to testify at length about the unsubstantiated allegations—including racial discrimination—underlying his 2011 lawsuit. The City contends the evidence should have been substantially limited or excluded, as the evidence was irrelevant to Jacobs's retaliation claims, and more prejudicial than probative.

---

argument on appeal. In any event, our review of the record discloses no support for the position that Jacobs would have remained in an acting position after Chief Nicholson made her H-6 appointments in December 2019.

20

*(a)  Additional Background*

The City filed a motion in limine to exclude evidence concerning the substance of Jacob's prior lawsuit and events outside the relevant statutes of limitations.  The City asserted it was not disputing that Jacobs filed a prior lawsuit, but argued the substance of his prior claims was irrelevant and highly prejudicial.  The trial court denied the motion, stating, "Brief mention of the substance is permitted."

At trial, the court permitted Jacobs to testify at some length about the allegations underlying his prior lawsuit, over repeated objections by the City.  For instance, Jacobs testified that his time at academy was the worst experience of his life, noting tests or tasks that he allegedly failed or was unfairly docked points for.  He testified that after he injured his shoulder and was put on cleaning duty, he was "treated like a mascot" and made to clean latrines "with a broke shoulder," sweep the 8-acre facility with a broom and dustpan on his hands and knees, and was called a "house boy" and "janitor."  He also testified that an instructor hit him in the head with a tool and that he repeatedly failed a test he knew he was passing until he had members of the Black Firefighter's Association film it.

*(b)  Analysis*

We begin by addressing the City's claim that the evidence concerning the allegations underlying the prior discrimination lawsuit lacked relevance to Jacobs's retaliation claims.

Only relevant evidence is admissible.  (Evid. Code, § 350.)  Relevant evidence is evidence "having any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action."  (*Id.* § 210.)  Evidence is relevant if it tends " ' "logically, naturally, and by reasonable inference" to establish material facts such as identity, intent, or

21

motive.' " (*People v. Williams* (2008) 43 Cal.4th 584, 633.) "On appeal, we apply the abuse of discretion standard in reviewing a trial court's ruling on the admissibility of evidence." (*People v. Chavez* (2018) 22 Cal.App.5th 663, 702 (*Chavez*).)

Here, the challenged evidence was relevant to Jacobs's claims of retaliation under FEHA and Labor Code section 1102.5. The trial court instructed the jury that to establish a retaliation claim under FEHA, Jacobs had to prove that he complained about discrimination, and that his complaints of discrimination were a "substantial motivating reason" for the City's decision not to assign him to an arson investigator position after March 2018. The court further instructed that Jacobs did not actually have to prove discrimination, just that he reasonably believed the City's conduct was unlawful. Similarly, the court instructed that to establish a whistleblower retaliation claim under the Labor Code, Jacobs had to prove he "disclosed to the City or to another government agency that he believed the City had engaged in a violation of a state or federal statute or a violation of or noncompliance with a local, state or federal rule or regulation," that "[he] had a reasonable cause to believe that the information disclosed a violation of a state or federal statute or a violation of noncompliance with a local, state or federal rule or regulation," and that his disclosure of information was a "contributing factor" in the City's decision not to assign him to an arson investigator position. Plainly, the fact that Jacobs filed a prior lawsuit, which the City settled, was relevant to establishing that Jacobs complained about unlawful racial discrimination, and that he reasonably believed he suffered unlawful racial discrimination.

Next, the City contends the evidence was more prejudicial than probative, insofar as Jacobs's claims were for retaliation based on protected

22

activity, not racial discrimination, and the City never contested that Jacobs engaged in protected activity.

Even if evidence is relevant, a "court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will . . . create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." (Evid. Code, § 352.) "The term 'prejudice,' within the meaning of Evidence Code section 352, is not simply damage to the defense that naturally flows from relevant and highly probative evidence, but is instead an emotional reaction that inflames the jurors' emotions, motivating them to have a bias against, or to prejudge, an individual based on evidence that has only slight probative value on the issues. [Citations.] Under that statute, evidence is substantially more prejudicial than probative if it poses an intolerable risk to the fairness of the proceedings or the reliability of the outcome and renders the defendant's trial fundamentally unfair." (*Chavez, supra*, 22 Cal.App.5th at p. 702.) Again, we review the ruling for abuse of discretion. (*Ibid.*)

Here, the trial court allowed Jacobs to testify at some length and in detail about the allegations underlying his prior discrimination lawsuit. Though reasonable minds might disagree about how much of that testimony was too much, ultimately we cannot conclude the court's allowance exceeded the bounds of reason under the circumstances. Although the City insists it did not dispute that Jacobs engaged in protected activity, there is no indication that the City offered to stipulate to the necessary elements of Jacobs's causes of action. Consequently, Jacobs had to prove to the jury that he engaged in protected activity and at least reasonably believed he suffered unlawful racial discrimination. Moreover, the court did in fact curb questioning on the specific factual allegations underlying the prior lawsuit,

23

cautioning counsel that the testimony should be kept brief and informing the jury that the evidence was just "background information" that was "not directly relevant to the issues" being tried.

In sum, the trial court did not abuse its discretion in admitting the testimony about Jacobs's prior lawsuit.

### 2. *"Me Too" Evidence*

The City argues the trial court erred in admitting "me too" testimony from two witnesses, Mark Johnson and Kevin Smith.

### *(a) Additional Background*

Mark Johnson testified he worked for the Department in various capacities from 1991 to 2021. As relevant here, Johnson was promoted to battalion chief around 2010 and assigned to the airport, then promoted to Assistant Deputy Chief of the Airport (civil service classification H-51)—a position selected by Chief of the Department in conjunction with the Director of the Airport, with the Mayor acting as tiebreaker. Johnson testified he filed a discrimination lawsuit against the Department around 2009 over the battalion chief exam, which seemed to have negatively impacted African Americans and the case settled in 2014 or 2015. Then, in 2015, although the Director of the Airport recommended his appointment as Assistant Deputy Chief of the Airport, Chief Hayes-White appointed Rudy Castellanos. After Castellanos left, and despite the renewed recommendation of the Director of the Airport to select Johnson, Hayes-White appointed Khai Ali as the next Assistant Deputy Chief of the Airport. Johnson was finally appointed to the position in early 2020 by Chief Nicholson.

Kevin Smith testified he worked for the Department in various capacities from 1989 to 2021; he became a battalion chief in 2008 and remained so until his retirement. Smith was a member and former office

24

holder in the Black Firefighters Association. Smith testified he filed two lawsuits against the Department: one in 1990 when the Department tried to terminate him as a probationer at the Division of Training; and another in 2010 regarding an examination for promotion. Chief Hayes-White denied him an appointment as Assistant Deputy Chief of the Airport, and around 2020 Chief Nicholson selected Johnson rather than him for the position.

### *(b) Analysis*

Initially, we note the City's failure to object during the alleged improper "me too" testimony forfeits review of the claim on appeal. (Evid. Code, § 353, subd. (a).) In any event, the City fails to show that admission of the evidence resulted in a "miscarriage of justice." (Cal. Const., art. VI, § 13; Evid. Code, § 353, subd. (b).) "A 'miscarriage of justice' occurs when the party appealing shows that a 'different result would have been probable if the error had not occurred.'" (*Colombo v. BRP US Inc.* (2014) 230 Cal.App.4th 1442, 1475.) Here, the City does not even argue that the result at trial would have been different but for the admission of this evidence, and we see no basis for such a conclusion. Not only was Johnson and Smith's alleged "me too" testimony brief, but their situations were factually different from Jacobs's and even allowed the City to argue that others in the Department were promoted even though they had sued the City. In sum, this claim provides no basis for relief.

### *3. Hearsay Statement of Mark Gonzales*

The City contends the trial court erred in admitting a hearsay statement by Deputy Chief Gonzales because Jacobs failed to establish that Gonzales had authority to speak on the Department's behalf about Jacobs's future prospects for acting or vacation relief assignments. The City also contends the hearsay statement was irrelevant to Jacobs's retaliation claim

because there was no evidence Gonzales was involved in any of the staffing decisions at issue in this case.

### (a) Additional Background

John Darmanin testified that around mid-2014 he was the captain of the arson unit, and the unit's workload was enormous at the time. Although the unit had been budgeted for ten to eleven investigators, there were only five investigators and the unit was impacted if anyone became unavailable. In 2015, Darmanin—with the permission of his direct supervisor—met with Deputy Chief Gonzales, who was number two in command to Chief Hayes-White and oversaw the Department's operations. He and Gonzales went down the eligibility list, and in the context of discussing acting assignments and vacation relief, Jacobs's name came up and Gonzales chuckled. Gonzalez commented that Jacobs was a "shit disturber" who had a lawsuit against the City. Gonzalez then indicated something along the lines of the City did not "want that kind of trouble down at arson too." The trial court overruled the City's hearsay objection to this latter statement based on the "[p]arty opponent exception." Darmanin went on to testify that while Gonzales was not the appointing officer at the time, Gonzales authorized persons on the eligibility list below Jacobs to go to the arson unit to provide vacation relief.

### (b) Analysis

Though neither party makes an argument concerning this point, we observe Gonzales's comment that Jacobs was a "shit disturber" does not appear to be hearsay, while the statement that the City did not "want that kind of trouble down at arson too," which Gonzalez made while referencing Jacobs's prior lawsuit, is hearsay. " 'Hearsay evidence' is evidence of a statement that was made other than by a witness while testifying at the hearing and that is offered to prove the truth of the matter stated." (Evid.

26

Code, § 1200, subd. (a).)

That said, the City's argument that the hearsay statement was irrelevant need not detain us long. The hearsay statement was direct evidence that Jacobs, in 2015, was not considered for an acting arson investigator position or even as vacation relief for the arson unit because he filed a lawsuit against the Department. Darmanin testified Gonzales actually did authorize persons below Jacobs on the eligibility list to provide vacation relief to the arson unit. Further, Chief Hayes-White confirmed that, while she had the final word in making permanent appointments and acting assignments, she often would rely on her deputy chiefs and assistant deputy chiefs in making decisions, and that those below her in rank sometimes made short duration assignments. Gonzales's statement was also evidence that high-ranking Department officials knew about and considered Jacobs's prior lawsuit in the context of making appointments or assignments. Considering the nature of the retaliatory conduct and the proximity in time to the promotion denials at issue, along with the other trial evidence, it is not unreasonable to infer from Gonzales's statement that the Department considered Jacobs's prior lawsuit when making staffing decisions in 2017 and 2018.

We next turn to the City's argument that the trial court erred in admitting the hearsay statement under the party opponent exception. For the reasons below, we are not convinced.

Evidence Code section 1222 sets out the "Authorized admission" hearsay exception as follows: "Evidence of a statement offered against a party is not made inadmissible by the hearsay rule if: [¶] (a) The statement was made by a person authorized by the party to make a statement or statements for him concerning the subject matter of the statement; and

27

[¶] (b) The evidence is offered either after admission of evidence sufficient to sustain a finding of such authority or, in the court's discretion as to the order of proof, subject to the admission of such evidence."

"The authority of a declarant employee to make a statement 'for' an employer 'concerning the subject matter of the statement' can be implied, as well as express." (*O'Mary v. Mitsubishi Elec. America, Inc.* (1997) 59 Cal.App.4th 563, 570 (*O'Mary*).)  The determination of an employee's authorization to make a given statement generally "requires an examination of the nature of the employee's usual and customary authority, the nature of the statement in relation to that authority, and the particular relevance or purpose of the statement." (*Ibid.*)

Case law is illustrative.  In *O'Mary*, *supra*, 59 Cal.App.4th 563, Herb Craft, the vice-president in charge of program development for Mitsubishi Electronics called many of " 'his' " managers into a conference room and told them that the person responsible for founding the various Mitsubishi entities in the United States and senior managing director at Mitsubishi Electronics made a statement about getting rid of managers over 40 and replacing them with " 'younger, more aggressive managers.' " (*O'Mary*, at p. 566.)  At the meeting, the president of Mitsubishi Electronics concurred in the statement. (*Ibid.*)  One of the managers relayed these hearsay statements during a deposition in an age discrimination case filed against Mitsubishi Electronics. (*Id.* at p. 568.)  The trial court excluded the hearsay, and the Court of Appeal reversed. (*Id.* at pp. 570–577, 585.)

The *O'Mary* court concluded the statement was admissible under the authorized admission hearsay exception because Craft occupied a high position in the employer's hierarchy, and "[p]lace in an employer's hierarchy undoubtedly is important in determining authority to speak." (*O'Mary*,

28

*supra*, 59 Cal.App.4th at p. 572.)  Moreover, though Craft's position as a vice-president did not automatically confer on him authority to make admissions on behalf of the company, the "nature of the statement and its particular relevance comes within what an ordinary person would expect to be the scope of Craft's authority." (*Ibid.*)  That is, Craft's role, as vice-president, was "to convey or relay company policy to subordinate managers.  The role of a vice-president is to coordinate the activities of his or her middle managers to accomplish the goals of the president and board of the company." (*Id.* at p. 573.)

Here, Gonzales was positioned very high in the Department's hierarchy as second in command only to Chief Hayes-White.  Moreover, the nature of the statement and its particular relevance comes within what an ordinary person would expect to be the scope of Gonzales's authority.  Not only was Gonzales the "operations chief" who "oversaw the operations of the fire department," but he provided recommendations to Hayes-White about promotions and had the power to authorize and did authorize persons to serve as vacation relief in the arson unit.  Gonzales's power over staffing decisions was further evidenced by the fact that Darmanin specifically met with Gonzales to advocate for additional staff, and did so only after obtaining permission from his direct supervisor to do so.

In sum, we reject the City's argument that Gonzales's hearsay statement was improperly admitted.

### 4. *Attorney Misconduct*

The City claims it was prejudiced by the misconduct of Jacobs's attorney in focusing on race discrimination throughout trial.  The City points out that during voir dire, Jacobs's attorney asked prospective jurors whether they believed they were in a post-racist society, then during trial, as

discussed, Jacobs offered more than a brief mention of the allegations underlying his prior race discrimination lawsuit despite the court's in limine order. Furthermore, Jacobs's attorney made the following assertions during closing argument: the appointment of Justice Ketanji Brown Jackson to the United States Supreme Court was controversial because she is African American; Jacobs's treatment as a new firefighter was akin to treatment during the Jim Crow era; and the Department settling the prior lawsuit without holding those accountable for Jacobs's mistreatment was evidence of how the Department felt about African-American people who complain about discrimination. The attorney also asked the jury to "compensate Mr. Jacobs for what he has had to do to survive as a black man in the hostile environment of the San Francisco Fire Department," while noting that Martin Luther King Jr. was murdered because he "went to bat for working people."

Notably, the City acknowledges it did not object to any of these statements or request any admonitions. But the City argues that an objection would have been futile, and that it was left with the "impossible choice between preserving objections and . . . sparing the City the optics of its counsel objecting to Martin Luther King and Ketanji Brown Jackson." We are not convinced.

" 'As a general rule a [party] may not complain on appeal of . . . misconduct unless in a timely fashion—and on the same ground—the [party] made an assignment of misconduct and requested that the jury be admonished to disregard the impropriety.' " (*People v. Hill* (1998) 17 Cal.4th 800, 820.) "The foregoing, however, is only the general rule. A [party] will be excused from the necessity of either a timely objection and/or a request for admonition if either would be futile. [Citation.] In addition, failure to

30

request the jury be admonished does not forfeit the issue for appeal if ' "an admonition would not have cured the harm caused by the misconduct." ' " (*Ibid.*)

Here, in denying the City's motion for new trial, the trial court suggested it would have permitted the arguments at issue despite any objections, insofar as they were a proper exploration of the evidence admitted. But the court pointedly stated, "I was not asked then to admonish, limit argument, or provide a limiting instruction or other cure," thereby indicating it would have been open to admonishing the jury or giving a limiting instruction. Thus, while the court indicated it would have overruled objections, it also appeared to indicate it would have considered options to cure any perceived harm by reorienting the jury to what was at issue in the case, i.e., whether the City retaliated against Jacobs for protected activity, *not* whether Jacobs had previously suffered racial discrimination.

In any event, even if we overlooked the City's failures to object and request admonitions, we would reject the City's claim on its merits.

"The law, like boxing, prohibits hitting below the belt. The basic rule forbids an attorney to pander to the prejudice, passion or sympathy of the jury." (*Martinez v. Department of Transportation* (2015) 238 Cal.App.4th 559, 566 (*Martinez*).) Here, the trial court indicated that counsel's argument was a proper "exploration of the evidence." In some respects, we agree. As discussed, to establish his retaliation claims, Jacobs had to prove that his prior discrimination lawsuit was a "substantial motivating reason" and "contributing factor" for the City's decision not to assign him to an arson investigator position, and that he reasonably believed the City's conduct was unlawful. Many of the arguments at issue were at least aimed at these elements of Jacobs's claims.

31

That said, we are troubled by the argument by Jacobs's counsel that the jury should return a "very big award" to "compensate Mr. Jacobs for what he has had to do to survive as a black man" at the Department. This was not directed at any of the elements of Jacobs's claims. Instead, it is reasonably viewed as an attempt to arouse the passions and sympathy of the jury by injecting race into this retaliation case and confusing the jury as to what exactly the case was about and what the noneconomic damages should be for, i.e., retaliation, not disparate treatment because of race.

Nonetheless, we conclude this inappropriate argument does not warrant reversal. "A jury's verdict may be vacated and a new trial ordered based on '[i]rregularity in the proceedings of the court, jury or adverse party.' [Citation.] Misconduct of counsel can amount to an irregularity and thus can be a ground for a new trial. [Citation.] However, it must be 'reasonably probable that the party moving for a new trial would have obtained a more favorable result absent the misconduct' in order to justify a new trial." (*McCoy v. Pacific Maritime Assn.* (2013) 216 Cal.App.4th 283, 303 (*McCoy*).) "The reviewing court evaluates the following factors to determine prejudice: ' "(1) the nature and seriousness of the misconduct; (2) the general atmosphere, including the judge's control of the trial; (3) the likelihood of actual prejudice on the jury; and (4) the efficacy of objections or admonitions under all the circumstances." ' " (*Pilliod v. Monsanto Co.* (2021) 67 Cal.App.5th 591, 635–636 (*Pilliod*).)

We review the order denying a motion for new trial for an abuse of discretion. (*Oakland Raiders v. National Football League* (2007) 41 Cal.4th 624, 636.) "The determination of a motion for a new trial rests so completely within the court's discretion that its action will not be disturbed unless a manifest and unmistakable abuse of discretion clearly appears." (*Jiminez v.*

32

*Sears, Roebuck & Co.* (1971) 4 Cal.3d 379, 387.) "However, where a motion for new trial on the ground of attorney misconduct has been denied, as is the case here, we review the entire record to make an independent determination of whether attorney misconduct was prejudicial." (*Pilliod*, *supra*, 67 Cal.App.5th at p. 631.)

Though we are troubled by counsel's argument, our review of the entire record discloses no basis for reversal. Significantly, the offending argument was brief. (*Garcia v. ConMed Corp.* (2012) 204 Cal.App.4th 144, 161–162 [finding no prejudice where the offending arguments were fleeting].) Moreover, any potential for prejudice was ameliorated by the City's closing argument, in which the City Attorney explained that this lawsuit was not about race discrimination, but about retaliation, and that Jacobs could not recover for the claims he settled in 2013.

We also observe that the trial court, in rejecting the new trial motion, concluded "there's no reason [to] think the verdict would have been any different had I limited counsel's argument." As one decision recently explained, a court's finding as to whether misconduct resulted in a miscarriage of justice is given great deference. (*McCoy*, *supra*, 216 Cal.App.4th at p. 304.) That is because the trial court sits "much closer to the alleged misconduct" and can "more closely monitor its possible effect on the jury." (*Ibid*.) In this regard, even though we review the record independently, we take note of the trial court's ruling to the extent it speaks to the " ' "general atmosphere" ' " of the trial. (*Pilliod*, *supra*, 67 Cal.App.5th at p. 636.)

Finally, the cases cited by the City do not call for reversal as they bear no resemblance to the facts of this case. (E.g., *Martinez*, *supra*, 238 Cal.App.4th at pp. 568–569; *McCoy*, *supra*, 216 Cal.App.4th at pp. 303–305.)

In sum, a new trial on the ground of attorney misconduct is not in order.

### 5. *Cumulative Error*

The City contends reversal is warranted due to cumulative effect of the alleged errors. But because we find only one harmless error concerning the closing argument of Jacobs's counsel, there is no error or prejudice to accumulate. Accordingly, we reject this claim. (*People v. Fernandez* (2013) 216 Cal.App.4th 540, 568.)

### C. **Retaliation**

Finally, the City argues the evidence was insufficient to support the jury's finding that the Department denied Jacobs an H-6 arson investigator position in retaliation for his exercise of protected activity. As discussed, Jacobs's FEHA claim required proof that his exercise of protected conduct was a "substantial motivating reason" in the Department's refusal to assign him to an arson investigator position, and his Labor Code retaliation claims required proof that it was a "contributing factor."

"Where an appellant argues that a particular verdict is not supported by sufficient evidence, our review 'begins and ends with the determination as to whether, on the entire record, there is substantial evidence, contradicted or uncontradicted, which will support the determination.' [Citation.] 'Substantial' refers to the quality, not the quantity, of the evidence. [Citation.] 'Substantial evidence is evidence that is "of ponderable legal significance," "reasonable in nature, credible, and of solid value," and " 'substantial' proof of the essentials which the law requires in a particular case." ' [Citation.] The testimony of a single witness may constitute substantial evidence as long as it is not physically impossible or inherently improbable. [Citations.] [¶] In exercising substantial evidence review, an

34

appellate court does not evaluate the credibility of the witnesses but defers to the trier of fact. [Citations.] Similarly, the court does not reweigh the evidence, but will uphold a judgment that is supported by substantial evidence even if substantial evidence to the contrary also exists." (*DeNike v. Mathew Enterprise, Inc.* (2022) 76 Cal.App.5th 371, 381–382, italics omitted.)

Here, the testimony of Jacobs and Connie Richards showed that in the summer of 2017 Fire Marshal de Cossio called Jacobs to ask if he was interested in an acting H-6 community outreach position. De Cossio effectively offered Jacobs that position, which Jacobs said he would accept. After Jacobs wrote a letter to Chief Hayes-White reiterating his acceptance of the community outreach position and expressing concern that he was not selected for an H-6 arson investigator position because of his prior lawsuit against the Department, Jacobs never heard about the community outreach position again. Instead, the community outreach position that he believed he accepted was reclassified around September or October 2017 to an H-4 fire inspector position, and another firefighter, Tomie Kato, got that job.

Though a reasonable factfinder could have believed the H-6 community outreach position was reclassified for practical purposes as de Cossio testified, it was not unreasonable for the jury below to conclude the position was reclassified and withheld from Jacobs because of his prior protected activity. The evidence showed that Chief Hayes-White knew about Jacobs's prior lawsuit, not only because of Jacobs's letter, but also because she personally approved the prior lawsuit's settlement. Moreover, evidence including Darmanin's testimony regarding a statement made by Gonzales showed that just two years before the H-6 community outreach position was reclassified out of existence while Jacobs was at the top of the eligibility list, Jacobs had been passed over to act as vacation relief for the arson unit

35

because of his prior lawsuit. On this record, the jury could reasonably infer that in October 2017, the fact of Jacobs's prior lawsuit played into the Department's decision-making calculus.

Similarly, the evidence established that in April 2018 Pruitt canvassed the H-6 eligibility list for interest in an acting arson investigator position, and Jacobs was at the top of the list among those who expressed interest in that position. Pruitt was under the impression the position was going to be filled and pushed for that result, but the Department did not act. Instead, the Department waited until December 2019 to fill the acting position, using a new eligibility list that did not list Jacobs at its top. In 2020, Jacobs asked Pruitt if the Department had known he was up for the position in 2018; Pruitt said yes, and "once [Jacobs's] name was mentioned and it went up the chain, it went away." On this record, the jury could reasonably have inferred that, even though Pruitt had described an "urgent" need for additional staff in the arson unit, the Department left the acting position unfilled because Jacobs, having previously sued the City, was next on the list.

Beyond the foregoing two instances when promotional opportunities did not materialize for Jacobs, we note the evidence that Jacobs was removed from the eligibility list in October 2021 for allegedly falsifying that he had responded to 100 fires in his H-6 application. Jacobs was removed based on a fire history report that Chief Nicholson testified was her practice to run for anyone applying for an arson investigator position. The Chief Information Officer for the Department, Jesus Mora, testified anyone can run the report, however, he has rarely been asked to run the report; indeed, Mora could not remember when he last ran it, or even give an estimate of how often he ran it. He also testified that certain kinds of fires were not included in the report, such as cooking fires, even though Chief Nicholson testified that cooking fires

36

are counted in determining whether a firefighter has responded to 100 fires. David Johnson, a witness for the City and a City employee for about 32 years, testified that he was not aware of the Department ever questioning anyone but Jacobs about their 100 fires documentation. The Department's conduct could reasonably be viewed as further evidence that the Department singled Jacobs out, taking steps to prevent Jacobs from obtaining the promotion that he sought.

In sum, viewing the whole record in a light most favorable to the judgment, we find substantial evidence supporting the jury's finding that the Department denied Jacobs an investigator position in retaliation for protected activity. In reaching this conclusion, we emphasize it is not our role to reweigh evidence.

## DISPOSITION

The judgment is affirmed in part and reversed in part. The order denying the motion for a new trial is reversed, and the trial court is directed to enter a new order granting the motion for a new trial only on the issue of economic damages. In all other respects, the judgment is affirmed. The parties are to bear their costs on appeal. (Cal. Rules of Court, rule 8.278.)

37

_____
Fujisaki, Acting P. J.

WE CONCUR:


_____
Petrou, J.


_____
Rodríguez, J.


*Jacobs v. City & County of San Francisco* (A167220)